**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>**COZY HARBOR SEAFOOD, INC.,**<br><br>Debtor. | Chapter 11<br><br>Case No. 25-20160<br><br>(Request for Joint Administration Pending) |
| In re:<br><br>**CASCO BAY LOBSTER CO., INC.,**<br><br>Debtor. | Chapter 11<br><br>Case No. 25-20161<br><br>(Request for Joint Administration Pending) |
| In re:<br><br>**ART'S LOBSTER CO., INC.,**<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 25-20162<br><br>(Request for Joint Administration Pending) |

**DECLARATION OF JOHN S. NORTON, JR. IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, John S. Norton, Jr., pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a shareholder (either directly or indirectly) and I manage the above-referenced debtors and debtors-in-possession, Cozy Harbor Seafood, Inc. ("**Cozy Harbor**"), Casco Bay Lobster Co., Inc. ("**Casco Bay**"), and Art's Lobster Co., Inc. ("**Art's Lobster**" and, collectively with Cozy Harbor and Casco Bay, the "**Debtors**").

2. I have decades of experience in the ownership, management, and operation in the seafood processing, sales, and distribution business. I am familiar with the Debtors' day-to-day

---

[1] The last four digits of the federal taxpayer identification numbers for the debtors are as follows: Cozy Harbor Seafood, Inc.: 8494; Casco Bay Lobster Co., Inc.: 0247; and Art's Lobster Co., Inc.: 1363. The principal place of business for the debtors is 75 St. John Street, Portland, ME 04102.

operations, businesses, debt structure, and financial affairs. I am authorized to submit this Declaration in support of the Debtors' chapter 11 petitions and the First Day Motions (as defined below), as well as other pleadings that may be filed in the Debtors' cases. All facts set forth herein are based on my personal knowledge, on information supplied to me by others within the Debtors' organizations, upon my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations, financial condition, and present liquidity needs. If I were called to testify, I could and would testify competently to the facts set forth herein.

3. Contemporaneously hereto (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Maine (the "**Bankruptcy Court**") to commence the above-captioned chapter 11 cases. To familiarize the Bankruptcy Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration as follows:

**Part I** provides a general overview of the Debtors' history and operations;

**Part II** provides an overview of the Debtors' prepetition debt structure;

**Part III** describes the circumstances leading to these chapter 11 cases; and

**Part IV** sets forth the factual bases for the relief requested in each of the First Day Motions.

**I.      General Overview of the Debtors' History and Operations**

4. Each of the Debtors is a corporation organized and existing under the laws of the State of Maine. The principal place of business for the Debtors is 75 St. John Street, Portland, Maine 04102. The Debtors do not own any real estate, but rather they lease real estate from various non-debtor affiliates.

5. From its headquarters in Portland, Maine, Cozy Harbor, in coordination with Art's Lobster and Casco Bay, buys, processes, and distributes premium-quality lobster tails, lobster

2

meat, and live lobster (among other seafood) throughout the United States, Canada, Asia, and Europe.

6. Cozy Harbor works directly with Canadian and Maine seafood dealers, while Casco Bay Lobster and Art's Lobster work directly with fisherman to purchase the freshest seafood products for the Debtors' customers, including purchasing daily catches from Cundy's Harbor, Boothbay Harbor, Casco Bay, South Bristol, and Tenants Harbor.

7. Casco Bay historically operated as a float-based lobster buying operation at Little Chebeague Island and transported lobster and bait on an owned vessel to and from Cozy Harbor's Union Wharf facility. Casco Bay ceased operations at Little Chebeague Island in 2024 and, today, conducts business at Union Wharf relying on Cozy Harbor's employees and facilities.

8. Art's Lobster operates a land-based lobster buying operation on a wharf in Tenants Harbor, Maine, which it leases from a non-debtor affiliate. Art's Lobster has employees who are paid through the same payroll as Cozy Harbor, but ADP reports Art's Lobster's payroll information separately for tax purposes.

**II.    Overview of Debtors' Prepetition Secured Debt Structure**

9. The Debtors (as borrowers) are parties to that certain Loan Agreement with Keybank National Association (the "**Prepetition Lienholder**") (as lender) dated September 29, 2022, as was amended from time to time prior to the Petition Date, and that certain Revolving Promissory Note (Line of Credit) of the same date in the maximum original principal amount of **$8,000,000.00.** The Debtors (as grantors) are also parties to that certain Security Agreement dated September 29, 2022, with the Prepetition Lienholder, pursuant to which the Debtors granted certain liens and other rights to the Prepetition Lienholder to secure the Debtors' obligations, including liens on accounts and inventory. The Prepetition Lienholder filed UCC-1 Financing

3

Statements with the Maine Secretary of State as to each Debtor, with each filing dated on or about September 29, 2022. As of the Petition Date, the Prepetition Lienholder was owed approximately **$4,900,000** by the Debtors.

10.   In addition, Cozy Harbor (as borrower) is party to that certain loan transaction with Camden National Bank ("**CNB**"), pursuant to which CNB holds a security interest in certain identified equipment owned by Cozy Harbor, including various conveyors, tables, scales, automation systems, tooling, blades, and racks. On February 22, 2021, CNB filed UCC Financing Statement No. 20211222109000090-51 with the Maine Secretary of State, identifying the specific equipment collateral of CNB. As of the Petition Date, Cozy Harbor owed CNB approximately **$330,000**.

### III.   Circumstances Leading Up to the Chapter 11 Filing

11.   The Debtors' businesses are impacted heavily by the price of seafood that it purchases for processing. Premised on price instability arising first out of the Covid pandemic and then out of uncertainty due to tariff threats, the Debtors have had trouble operating within workable margins.

12.   In the months and years prior to the Petition Date, the Debtors diligently explored a range of options to address their ongoing challenges related to maintaining sufficient cash flow to satisfy their debt and operational obligations. Ultimately, after exploring an out-of-court sale, recapitalization, and other options, the Debtors, together with their advisors, determined to commence these chapter 11 cases to stabilize the Debtors' balance sheets and optimize the value of their estates for the benefit of all parties in interest through a chapter 11 restructuring.

### IV.   First Day Motions[2]

---

[2] Capitalized terms used, but not defined in this First Day Motions section of this Declaration, shall have the meaning ascribed to such terms in the respective First Day Motion.

4

13. The Debtors have filed or expect to file a number of motions (collectively, the "**First Day Motions**") seeking orders granting various forms of relief, including certain relief on an emergency or expedited basis. I have reviewed the First Day Motions, including exhibits, and I believe that the relief sought in the First Day Motions is necessary to stabilize the Debtors' businesses, facilitate the efficient administration of the chapter 11 cases, lessen the impact of the chapter 11 cases on the Debtors' day-to-day operations and employees, and facilitate a successful reorganization of the Debtors. I believe that the relief requested in the First Day Motions is critical to avoiding imminent and irreparable harm in the early stages of these cases to the Debtors, their estates, and critical stakeholders, including customers, creditors, and employees, and to maximize the value of their assets for the benefit of all stakeholders.

A. **MOTION OF DEBTORS FOR ENTRY OF AN ORDER DIRECTING JOINT ADMINISTRATION OF CHAPTER 11 CASES AND RELATED RELIEF (the "Joint Administration Motion")**

14. I understand that the Debtors are requesting through the Joint Administration Motion that their chapter 11 cases be jointly administered for procedural purposes only.

15. The issued and outstanding shares of Cozy Harbor are held by me (66%), Joseph B. Donovan (25%), and Joel Knox (9%). Casco Bay and Art's Lobster are wholly owned (100%) by Cozy Harbor.

16. I believe that joint administration of the chapter 11 cases will promote fair and efficient administration of these chapter 11 cases and will ease the administrative burden on this Court and all parties in interest. Because the Debtors' management, financial affairs, and operations are closely related, I anticipate that many of the motions, hearings, and orders in the bankruptcy proceedings will affect all of the Debtors. Joint administration will also reduce the volume of paper that otherwise would be filed with the Clerk of the Court because it will avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and

5

orders.

B. **MOTION OF DEBTORS FOR ENTRY OF AN ORDER: (I) AUTHORIZING THE USE OF CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; AND (III) GRANTING RELATED RELIEF (the "Cash Collateral Motion")**

17. Through the Cash Collateral Motion, I understand that the Debtors seek interim, and then final, authority to use Cash Collateral to fund necessary expenses in the cases, including payroll, supplies and inventory, utilities, rent, and other ordinary operating expenses as set forth in the Budget.

18. Access to the use of Cash Collateral both short- and long-term is necessary for the Debtors to fund required expenses during the chapter 11 cases, as described in the Budget, which I believe will preserve and maximize the going-concern value of the estates for the benefit of all parties. Other than Cash Collateral, the Debtors do not have access to funds and would be unable to pay these necessary expenses. Accordingly, access to and use of Cash Collateral will provide the Debtors with the liquidity necessary to ensure that the Debtors have sufficient working capital and can meet their obligations as debtors-in-possession in the cases.

19. The inability to use Cash Collateral, on the other hand, would mean that the Debtors' business operations would have to cease, be subject to liquidation in bankruptcy or a state court proceeding, or the businesses would need to be placed into a receivership under applicable state law. Any of these outcomes would cause substantial harm to the Debtors and limit potential recoveries to creditors. This would cause irreparable harm not only to the Prepetition Lienholder, but also to the value of the Debtors' businesses, including as going concerns.

20. Further, the Debtors incur these expenses on a frequent, sometimes unpredictable basis, and, therefore, emergency relief is necessary so the Debtors may have authority to use Cash Collateral to fund these necessary expenses in the ordinary course, including upcoming payroll (as

described further in the Payroll Motion), as such expenses are identified in the early weeks of the Budget.

21. The Debtors prepared the Budget in consultation with their financial advisors. I was personally involved in that process, working with Opus Consulting Group and Spinglass Management Group. The Budget is based on the historic financial performance of the Debtors, which was then adjusted for chapter 11 expenses and other anticipated impacts from being in chapter 11. I believe that the Budget reflects a reasonable estimate of revenue and expenses, including expenses that are necessary to sustain ongoing operations of the Debtors in chapter 11 and to fund the administrative costs of these cases.

C. **MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO: (A) PAY PRE-PETITION EMPLOYEE COMPENSATION AND RELATED PAYROLL AND BENEFIT OBLIGATIONS; (B) CONTINUE EMPLOYEE BENEFIT PROGRAMS IN THE ORDINARY COURSE; (C) MAINTAIN EMPLOYEE INSURANCE POLICIES AND PAY RELATED PREMIUMS; AND (D) MAINTAIN OTHER INSURANCE POLICIES AND PAY RELATED PREMIUMS AND OBLIGATIONS (the "Payroll Motion")**

22. I understand that, through the Payroll Motion, the Debtors seek authority to, inter alia, maintain various employee and employee-related programs and fund certain wage and other obligations that arose prior to the Petition Date.

23. As of the Petition Date, Cozy Harbor had 107 full-time employees (which included 73 seasonal employees), and Art's Lobster Co., Inc. had 3 full-time employees (which included seasonal employees) and 1 part-time employee (collectively, the "**Employees**"). Of the Employees employed by Cozy Harbor, 92 are paid on an hourly basis and 15 are salaried. Of the Employees employed by Art's Lobster, 2 are paid on an hourly basis and 2 are salaried. The Employees are paid weekly, on Fridays, for their services in the preceding period of Sunday to Saturday, with the funds required to satisfy the payroll obligations drawn from the Debtors' account(s) on Thursday of each week.

7

24. Payroll is funded and managed through ADP as the payroll company (the "**Payroll Company**"). The Debtors pay the Payroll Company a service fee totaling **$460-$470** per week (as may vary from week to week based on the number of Employees, the "**Payroll Fee**").

25. The Employees hold various positions for the Debtors that are critical to Debtors' ongoing operations and ability to meet their obligations as debtors-in-possession. Those positions include roles related to food safety, operations, accounting, sales, and various supervisory, managerial, and executive positions. The Employees' skills, knowledge, and understanding of the Debtors' businesses, products, and general operations, are essential to the effective operation of the Debtors' businesses and to successful, value-maximizing strategies in the Debtors' chapter 11 cases.

26. Further, just as the Debtors depend on the Employees to operate their businesses on a daily basis, the Employees also depend on the Debtors. I understand that many of these individuals and their families rely on payments received from the Debtors for their basic living necessities. In an effort to minimize the personal hardship to the individuals and to maintain morale and stability in the Debtors' business operations during this critical juncture, the Debtors seek authority to continue to pay and honor (subject to applicable Orders of this Court and the Bankruptcy Code) amounts arising under or in connection with the Debtors' pre-petition obligations to the Employees.

27. The Debtors also are responsible for wage and salary obligations to their Employees. The Employees are owed and have accrued various prepetition payroll payments that were not yet paid or otherwise realized in the ordinary course as of the Petition Date. The Debtors do not seek to modify the amount of compensation paid to any "insider" of the Debtors through the Payroll Motion.

28. As of the Petition Date, the Employees were owed and had accrued various sums for wages for pre-Petition Date services (the "**Employee Compensation Obligations**"). The Debtors are able to estimate the amounts owed to the Employees based on payroll amounts for prior payroll periods. Specifically, average gross wages in recent weeks were approximately **$99,000.00** (and approximately **$108,000.00** with employer-side taxes), which is composed of approximately **$70,000.00** for hourly Employees and **$29,000.00** for salaried Employees. Because each Friday payroll distribution is for services previously provided in the prior week, a pro rata portion of the Employee Compensation Obligations paid after the Petition Date will constitute compensation for prepetition services.

29. The Debtors also withhold taxes and other withholdings from wages and salaries as required by federal, state, and local laws. In particular, these laws require the Debtors to withhold amounts related to federal and state income taxes, Social Security and Medicare taxes, and certain wage garnishments for remittance to the appropriate federal, state, or local authorities, or other third parties (collectively, the "**Withheld Amounts**"). The Debtors also are required to pay additional amounts for the employers' contributions to Social Security and Medicare taxes (together with the Withheld Amounts, the "**Payroll Taxes**"). A portion of the Payroll Taxes will relate to prepetition services.

30. In addition, the Debtors provide the following benefits to their eligible Employees (such benefit programs, the "**Employee Benefit Programs**" and the Debtors' payment obligations in providing the Employee Benefit Programs to eligible Employees, the "**Benefit Obligations**"):

    (a) Health insurance provided through Anthem Blue Cross/Blue Shield, with the Debtors funding 65% of the premiums for such coverage;

    (b) Dental insurance through Delta Dental, with the Debtors not contributing to the premiums for such coverage;

    (c) Short-term and long-term disability through Mutual of Omaha, with the

9

        Debtors funding 65% of the premiums for such coverage; and

(d)    Reimbursement to Employees for purchases made by Employees on behalf of the Debtors in the ordinary course, which amount is typically **$50.00** or less at any given time.

31.    If the Payroll Motion is not approved before the Debtors' next payroll obligations are due to be drawn by the Payroll Company on July 3, 2025 (due to the July 4th holiday), the Debtors' business operations—and prospects for successful reorganizations or sales—will be severely harmed because the Debtors will be unable to make ordinary payroll payments.  The Debtors' ability to continue to compensate Employees without interruption is critical to customers' and other key constituents' support of the Debtors' chapter 11 cases.  Further, any disruption or delay in payments to Employees postpetition could result in a negative reaction among Employees, customers, creditors, and others, and it is of the utmost importance for the Debtors that they maintain strong relationships and support in their chapter 11 cases as they work to reorganize in a timely, cost-effective manner.  Failure to ensure that the Employees receive their expected pay could demotivate them or cause some to seek alternative employment elsewhere, especially among seasonal Employees.  Thus, the Debtors seek an emergency hearing on the Payroll Motion so that the Debtors may reassure Employees that compensation payments will be made, settle quickly into the chapter 11 cases, and timely process payroll amounts and obligations for timely disbursement in the ordinary course.

**D.**    **MOTION OF DEBTORS FOR ENTRY OF AN ORDER: (I) APPROVING THE DEBTORS' PROPOSED ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES; (II) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES; (III) APPROVING PROCEDURES FOR RESOLVING ADDITIONAL ADEQUATE ASSURANCE REQUESTS; AND (IV) GRANTING RELATED RELIEF (the "Utilities Motion")**

32.    I understand that through the Utilities Motion, the Debtors seek authority to provide certain assurances of payment to utility providers and for this Court to establish certain procedures

related to ensuring uninterrupted utility services for the Debtors in chapter 11.

33. In the ordinary course, the Debtors receive utility services (collectively, the "**Utility Services**") from certain utility providers (collectively, the "**Utility Providers**") to sustain operations at their headquarters located at 75 St. John Street in Portland, Maine, and other operating locations. The Utility Services and Utility Providers, as well as the average monthly cost for each, are as follows:

| **Utility Provider** | **Utility Service** | **Avg. Monthly Bill** |
|---|---|---|
| Portland Water District | Water, Sprinkler, and Sewer | $17,398 |
| Unitil | Natural Gas | $6,467 |
| Central Maine Power | Electricity | $18,774 |
| **Total**: | | **$42,639** |

34. Uninterrupted Utility Services are essential for the Debtors to maintain their operations and meet their obligations in these cases. Any interruption in Utility Services, even for a brief period of time, would severely, and potentially irreparably, disrupt the Debtors' operations, potentially cause damage or other harm to the Debtors, and jeopardize the Debtors' reorganization efforts. Accordingly, it is critical to the success of the chapter 11 cases and in the best interests of creditors that the Utility Services continue without interruption during the cases

35. The Debtors intend to pay their postpetition obligations, including those owed to the Utility Providers, in a timely manner. The Debtors expect that funds on hand and revenue generated from future business operations, along with cash collateral authority, will be sufficient to pay the postpetition obligations related to the Utility Services on a timely basis. In addition, the Debtors' reliance on crucial utility services for the operation of their businesses provides them with a powerful incentive to stay current on their utility obligations.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 1, 2025                                /s/ John S. Norton, Jr.
                                                                 John S. Norton, Jr.