**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>**COZY HARBOR SEAFOOD, INC., CASCO BAY LOBSTER CO., INC., and ART'S LOBSTER CO., INC.,**<br><br>Debtors.[1] | **Chapter 11**<br><br>**Case No. 25-20160**<br><br>**(Jointly Administered)** |

**DEBTORS' MOTION FOR ENTRY OF ORDER: (I) AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO PAY PREPETITION CLAIMS, INCLUDING SECTION 503(b)(9) CLAIMS, OF CERTAIN CRITICAL VENDORS; AND (II) GRANTING RELATED RELIEF**

Cozy Harbor Seafood, Inc., Casco Bay Lobster Co., Inc., and Art's Lobster Co., Inc., the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by and through their undersigned proposed attorneys, hereby move (the "**Motion**") for entry of an order authorizing, but not directing, the Debtors to pay the claims of certain critical vendors and suppliers (collectively, the "**Critical Vendors**") arising from goods, inventory, and other products and materials delivered or provided to the Debtors prior to the Petition Date (defined below), a portion of which constitute administrative priority claims under 11 U.S.C. § 503(b)(9), as set forth in more detail on **Exhibit A** hereto (the "**Critical Vendor Claims**"). In support of this Motion, the Debtors state as follows:

**JURISDICTION, VENUE AND STATUTORY BASIS**

1. The United States District Court for the District of Maine (the "**District Court**") has original, but not exclusive, jurisdiction over the Debtors' chapter 11 cases pursuant to 28

---

[1] The last four digits of the federal taxpayer identification numbers for the debtors are as follows: Cozy Harbor Seafood, Inc.: 8494; Casco Bay Lobster Co., Inc.: 0247; and Art's Lobster Co., Inc.: 1363. The principal place of business for the debtors is 75 St. John Street, Portland, ME 04102.

U.S.C. § 1334(b). By the District Court's standing order of reference, this matter was referred to this Court pursuant to 28 U.S.C. § 157.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has constitutional authority to enter final judgment in this proceeding.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1408, and venue over this proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

4. The predicates for the relief sought herein are §§ 105(a), 363, 503, 1107 and 1108 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

### A. The Chapter 11 Cases

5. On July 1, 2025 (the "**Petition Date**"), the Debtors commenced their chapter 11 cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court.

6. The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession. To date, no operating trustee, examiner, or statutory committee has been appointed in the cases by the United States Trustee.

### B. The Debtors' Business Relationships with Critical Vendors

7. From their headquarters in Portland, Maine, the Debtors buy, process, and distribute premium-quality lobster tails, lobster meat, and live lobster (among other seafood) throughout the United States, Canada, Asia, and Europe. Cozy Harbor Seafood, Inc. works directly with Canadian and Maine seafood dealers, while Casco Bay Lobster Co., Inc. and Art's Lobster Co., Inc. work directly with fisherman to purchase the freshest seafood products for the Debtors' customers, including purchasing daily catches from Cundy's Harbor, Boothbay Harbor, Casco Bay, and

2

Tenants Harbor.

8. The Debtors, in the ordinary course of business, work closely with dozens of suppliers and vendors, including local and regional lobster dealers, that provide a wide variety of specialized products, including seafood inventory, that are critical to the Debtors' ongoing seafood processing and distribution businesses. Since the Petition Date, the Debtors have had extensive discussions with their vendors regarding outstanding prepetition claims, as well as postpetition deliveries required by the Debtors to sustain operations and payment terms. The Debtors' businesses cannot operate—and will suffer significant and immediate financial and reputational harm—if they do not maintain relationships with these vendors and suppliers, many of which are among a limited number of sources for their products or for which no readily available, sufficiently comparable, alternative exists in a timeframe that would not cause significant operational and cash flow disruption. This is especially true where the Debtors have developed a carefully orchestrated postpetition budget that is premised on ongoing operations, purchase of new inventory, and a consistent supply of these products to generate future cash flow.

9. As of the Petition Date, due to the timing of deliveries and invoicing, and existing payment terms, the Critical Vendors will have the Critical Vendor Claims arising prior to the Petition Date as set forth on **Exhibit A**. If the Debtors fail to pay the Critical Vendor Claims, then the Debtors believe—based on extensive, daily discussions with these parties—that the Critical Vendors will cease delivery of goods to the Debtors, which would disrupt the Debtors' post-petition cash flow and chapter 11 strategy. The loss of products provided by the Critical Vendors could result in the Debtors' inability to generate new inventory and sell that inventory to customers, which then generates accounts receivable that is converted to cash. Such harm from this disruption would likely far outweigh the cost of payment of the prepetition claims accrued in the ordinary

3

course of business held by the Critical Vendors. Moreover, the Debtors believe that jeopardizing their relationships with the Critical Vendors, and attempting to procure the supply from replacement vendors or suppliers, is not reasonably feasible in the timeframe required given the general lack of excess inventory in the lobster and other seafood markets at this time, would impose a severe strain on the Debtors' business operations, and would likely result in significant revenue loss. Even a temporary interruption of these delivers would impede the Debtors' operations, and the cumulative impact of such events could have a catastrophically adverse effect on the Debtors' businesses.

    C.    **The Debtors' Process for Identifying Critical Vendor Claims**

10. To identify the Critical Vendors and the Critical Vendor Claims, the Debtors reviewed their accounts payable list to identify those vendors likely to have prepetition claims that are most essential to the Debtors' postpetition operations pursuant to the following criteria:

    (a)    whether certain quality specifications or other requirements of the Debtors' customers prevent the Debtors from obtaining a vendor's products from alternative sources within a reasonable timeframe, including difficulties in sourcing alternatives at this time;

    (b)    whether alternative vendors are available that can provide the requisite volumes of similar products on equal (or better) terms, and if so, whether the Debtors would be able to continue operating while transitioning business thereto;

    (c)    the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

    (d)    whether a vendor meeting the foregoing criteria is able or likely to refuse to ship product to, or work for, the Debtors postpetition if their prepetition balances are not paid;

    (e)    whether that vendor provides favorable credit, pricing, or other terms that make the continued relationship beneficial for the estates;

    (f)    whether that vendor threatened to cease providing goods prior to or after the Petition Date based on unpaid invoices;

4

(g) whether the vendor is likely to hold an administrative expense claim under § 503(b)(9) of the Bankruptcy Code based on goods received by the Debtors within 20 days before the Petition Date; and

(h) the likelihood and scale of the immediate and irreparable harm that the Debtors and their estates would suffer if a vendor ceased or delayed deliveries, renegotiated trade terms, increased prices, or otherwise acted to disrupt the relationship as existed before the Petition Date.

11. The Debtors carefully applied the above-referenced factors and analyzed their accounts payable and cash needs to determine the scope of relief requested herein.

**D.    Customary Trade Terms**

12. Subject to Court approval, the Debtors intend to pay the Critical Vendor Claims only to the extent necessary to preserve their businesses. To that end, in return for paying such claims either in full or in part, the Debtors propose that they be authorized to require the Critical Vendors, as applicable, to provide materially similar trade terms for the postpetition procurement of goods as existed prepetition.

13. Specifically, the Debtors seek authority, but not direction, to condition payment of the Critical Vendor Claims upon such claimant's agreement to continue supplying such products to the Debtors pursuant to trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtors within their reasonable business judgment (the "**Customary Trade Terms**"). The Debtors reserve the right to require, in their discretion, that the Customary Trade Terms condition to payment be made in writing.

**RELIEF REQUESTED**

14. By this Motion, the Debtors seek entry of an order: (i) authorizing, but not directing, the Debtors to pay the Critical Vendor Claims as set forth on **Exhibit A**; and (ii) granting related relief.

5

**BASIS FOR RELIEF**

A. **The Critical Vendors Are Essential to Avoiding Any Unexpected or Inopportune Interruption to the Debtors' Business Operations.**

15. The Debtors believe that the products for which the Debtors must pay the Critical Vendors are necessary to ensure that there are not any unexpected or inopportune interruptions to their businesses. The Critical Vendors are the most cost-efficient and, in some cases, the only, source from which the Debtors can procure critical products within a timeframe that would permit the Debtors to avoid interruptions, delays, or shutdowns in their operations. Any failure to pay the Critical Vendor Claims would, in the Debtors' business judgment, likely result in the Critical Vendors refusing to provide necessary products to the Debtors, delaying deliveries, and/or renegotiating trade terms and pricing, which would have disastrous effects on the Debtors' businesses and undermine the Debtors' ability to preserve and maximize the value of their estates.

16. The Debtors believe that authority to pay the Critical Vendor Claims is vital to their efforts to preserve and maximize the value of their estates. Absent the relief requested herein, the Debtors believe that the Critical Vendors may refuse to do business with the Debtors and/or attempt to renegotiate trade terms and pricing that are less favorable to the Debtors—as some have already made such threats. Such result would immediately and irreparably damage the Debtors' efforts to successfully prosecute these chapter 11 cases and would distract from the Debtors' other ongoing efforts in these cases, to the detriment of the Debtors' estates and creditors.

B. **The Relief Requested Herein Is a Valid Exercise of the Debtors' Fiduciary Duties and Is Supported by the "Doctrine of Necessity."**

17. Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the

obligation to "protect and preserve the estate, including an operating business's going concern value." Id. Some courts have noted that there are instances in which a debtor can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id. The court in CoServ specifically noted that the pre-plan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." Id.

18. Consistent with a debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under § 363(b) of the Bankruptcy Code, which provides that, after notice and a hearing, the trustee "may use, sell, or lease, other than in the ordinary course of business, property of the estate," where a sound business purpose exists for doing so. See, e.g., In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that a sound business justification existed to justify payment of prepetition wages); Armstrong World Indus,. Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391, 397–98 (S.D.N.Y. 1983) (relying on § 363 of the Bankruptcy Code to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors).

19. In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on § 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Bankruptcy courts have invoked the equitable power of § 105 of the Bankruptcy Code to authorize the post-petition payment of pre-petition claims where such payment is necessary to preserve the value of a debtor's estate. See, e.g., Tropical Sportswear Int'l Corp., 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005)

7

("Bankruptcy courts recognize that section 363 is a source for authority to make critical vendor payments, and section 105 is used to fill in the blanks."). Courts have likewise acknowledged that "[u]nder [section] 105, the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing In re Ionosphere Clubs, Inc., 98 B.R. at 177); see In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization").

20.     This legal principle—known as the "doctrine of necessity"—functions in chapter 11 cases as a mechanism by which a bankruptcy court can exercise its equitable power to allow payment of critical pre-petition claims not explicitly authorized by the Bankruptcy Code. See, e.g., In re Just for Feet, Inc., 242 B.R. at 826 (finding that "to invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is critical to the debtor's [continued operation]."). The doctrine is frequently invoked early in a bankruptcy case, particularly in connection with those Bankruptcy Code sections that relate to payment of pre-petition claims. In one case, the court indicated its accord with "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of pre-petition claims where such payment is necessary 'to permit the greatest likelihood of . . . payment of creditors in full or at least proportionately.'" In re Structurelite Plastics Corp., 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988).

21.     Allowing the Debtors to pay the Critical Vendor Claims is appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going concern value and maximizing the value of property available to satisfy creditors. See Bank of Am. Nat'l Trust Savs. Ass'n v. 203 N. LaSalle St. P'Ship, 526 U.S. 434,

453 (1999).

22. As explained above, the products for which payment to the Critical Vendors is due are essential to ensure that there is not an unexpected or inopportune interruption to the operation of the Debtors' businesses. The Debtors also submit that the total amount to be paid to the Critical Vendors is minimal compared to the importance and necessity of the Debtors' uninterrupted receipt of the necessary products provided by the Critical Vendors. The Debtors, moreover, have further limited the relief to Critical Vendors: (i) from which the Debtors expect to be required to pay for prepetition goods; (ii) that are most likely to hold a § 503(b)(9) claim; and (iii) that threatened or are substantially likely to threaten to cease delivering materials to the Debtors based on unpaid prepetition claims.

23. Based on these circumstances, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is, therefore, justified under §§ 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code.

**C. Certain of The Critical Vendor Claims Are Likely Administrative Expense Claims That the Debtors Must Pay To Successfully Exit Chapter 11 Through a Plan.**

24. Section 503(b)(9) of the Bankruptcy Code provides for the allowance, as an administrative expense, of the value of goods sold to the Debtors in the ordinary course of their business and received by the Debtors within 20 days before the Petition Date. See 11 U.S.C. § 503(b)(9). In the ordinary course of business, the Debtors received goods from various vendors within the 20-day period immediately preceding the Petition Date, thereby giving rise to prepetition claims under § 503(b)(9) of the Bankruptcy Code. **Exhibit A** includes the estimated amount of the § 503(b)(9) claims that are included within the Critical Vendor Claims, and as reflected in **Exhibit A**, the Critical Vendor Claims are largely composed of § 503(b)(9) claims.

9

Further, most of the Debtors' relationships with the Critical Vendors are not governed by long-term contracts.  Rather, the Debtors obtain goods through purchase orders on an order-by-order basis.  As a result, the Critical Vendors may refuse to supply new orders without prompt payment of their § 503(b)(9) claims.  In light of the immense importance of the § 503(b)(9) claimants to the Debtors' operations, the Debtors believe that payment of the § 503(b)(9) claims is essential to avoid disruption to the Debtors' operations.  Moreover, because § 503(b)(9) claims are accorded administrative expense priority, such claims will need to be paid pursuant to a chapter 11 plan and payment in the ordinary course is a matter of payment timing to maintain crucial vendor relationships.

25.     The Debtors, therefore, submit that granting the relief sought in the Motion largely affects the timing of payments and would not have a negative impact on recoveries for other stakeholders.  See, e.g., In re Frontier Airlines Holdings, Inc., No. 08-11298 (RDD) (Bankr. S.D.N.Y. May 15, 2008) (order authorizing payment of prepetition claims entitled to administrative priority pursuant to § 503(b)(9) of the Bankruptcy Code); In re James A. Phillips, Inc., 29 B.R. at 398 (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants); see also In re Global Home Prods., LLC, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").

* * *

26.     In sum, satisfaction of the Critical Vendor Claims will enhance value for the benefit of all stakeholders by ensuring that the Critical Vendors continue to provide vital products to the Debtors at a critical juncture in these chapter 11 cases.  The Debtors' ongoing ability to obtain product and other goods as provided herein is key to their survival and necessary to preserve the

10

value of their estates. Absent payment at the outset of these chapter 11 cases, the Debtors could be denied access to the product and other goods necessary to maintain the Debtors' business operations and maximize the value of the Debtors' estates.

## REQUEST FOR WAIVER OF STAY

27. The Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[u]nless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h). As set forth above, the relief requested herein is essential to prevent irreparable damage to the Debtors' operations, going-concern value, and their efforts to pursue a restructuring of the businesses.

## NOTICE

28. The Debtors will provide notice of the filing of this Motion to: (a) the United States Trustee; (b) the Debtors' secured creditors or, if applicable, to counsel representing them; (c) the non-insider holders of the 20 largest unsecured claims against each of the Debtors or, if applicable, to counsel representing such holders; (d) applicable federal and state taxing authorities; and (e) any attorney of record or party that has requested notice pursuant to Bankruptcy Rule 2002.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order granting the relief requested herein and such other and further relief as the Court may deem just and proper.

| | |
|---|---|
| Dated:   July 23, 2025 | Respectfully submitted,<br>**BERNSTEIN, SHUR, SAWYER & NELSON, P.A.**<br><br>*/s/ D. Sam Anderson*<br>D. Sam Anderson, Esq.<br>Adam R. Prescott, Esq.<br>100 Middle Street<br>PO Box 9729<br>Portland, Maine 04104<br>Telephone: (207) 774-1200<br>Facsimile: (207) 774-1127<br>sanderson@bernsteinshur.com<br>aprescott@bernsteinshur.com<br><br>*Proposed counsel to the Debtors and Debtors in Possession* |