## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>**COZY HARBOR SEAFOOD, INC.,<br>CASCO BAY LOBSTER CO., INC., and<br>ART'S LOBSTER CO., INC.,**<br><br>Debtors.[1] | **Chapter 11**<br><br>**Case No. 25-20160**<br><br>**(Jointly Administered)** |

**MOTION FOR ENTRY OF: (I) ORDER (A) APPROVING BID PROCEDURES, (B)
SCHEDULING AUCTION AND SALE HEARING, (C) APPROVING FORM
AND MANNER OF NOTICE THEREOF, (D) APPROVING PROCEDURES FOR
ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND
(E) GRANTING RELATED RELIEF; AND (II) ORDER (A) APPROVING
SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR,
(B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF
CONTRACTS AND LEASES, AND (C)
GRANTING RELATED RELIEF**

Cozy Harbor Seafood, Inc., Casco Bay Lobster Co., Inc., and Art's Lobster Co., Inc., the

above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), hereby move

this Court (this "**Motion**"), pursuant to, among others, §§ 105(a), 363, 365, 503 and 507 of title 11

of the United States Code (the "**Bankruptcy Code**"); Rules 2002, 6004, 6006, 9007, 9008, and

9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and Rules 2002-

1 and 9014-1 of the Local Rules of the Bankruptcy Court for the District of Maine (the "**Local**

**Rules**"), for the entry of the following:

(i)      an order, substantially in the form filed herewith (the "**Bid Procedures Order**"),
(a) approving procedures in connection with the potential sale of substantially all
of the assets of the Debtors (the "**Bid Procedures**"), including approving certain
bid protections for a Stalking Horse Bidder (defined below) if one is selected;
(b) scheduling the auction and hearing to consider approval of the sale,
(c) approving the form and manner of notice thereof, (d) approving procedures

---

[1] The last four digits of the federal taxpayer identification numbers for the debtors are as follows: Cozy Harbor
Seafood, Inc.: 8494; Casco Bay Lobster Co., Inc.: 0247; and Art's Lobster Co., Inc.: 1363.  The principal place of
business for the debtors is 75 St. John Street, Portland, ME 04102.

related to the assumption and assignment of certain executory contracts and unexpired leases, and (e) granting related relief; and

(ii)    an order, substantially in the form to be filed following entry of the Bid Procedures Order (the "**Sale Order**"), (x) approving the sale of the Assets (defined below) free and clear of all liens, claims, encumbrances, and other interests (except assumed liabilities and permitted liens, if any), (y) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto, and (z) granting related relief.

In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.    The United States District Court for the District of Maine (the "**District Court**") has original, but not exclusive, jurisdiction over the Debtors' chapter 11 cases pursuant to 28 U.S.C. § 1334(b).  Pursuant to 28 U.S.C. § 157 and Rule 83.6 of the District Court's local rules, the District Court has authority to refer and has referred this proceeding to this Court.

2.    This is a core proceeding under 28 U.S.C. § 157(b).

3.    Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A.**    **The Chapter 11 Cases**

4.    On July 1, 2025 (the "**Petition Date**"), the Debtors commenced their chapter 11 cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court.

5.    The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession.  To date, no operating trustee, examiner, or statutory committee has been appointed in the cases by the United States Trustee.

6.    The Debtors' cases are being jointly administered for procedural purposes only.

**B.      The Debtors' History, and the Sale and Marketing Process**

7.      From their headquarters in Portland, Maine, the Debtors buy, process, and distribute premium-quality lobster tails, lobster meat, and live lobster (among other seafood) throughout the United States, Canada, Asia, and Europe.  Cozy Harbor Seafood, Inc. works directly with Canadian and Maine seafood dealers, while Casco Bay Lobster Co., Inc. and Art's Lobster Co., Inc. work directly with fisherman to purchase the freshest seafood products for the Debtors' customers, including purchasing daily catches from Cundy's Harbor, Boothbay Harbor, Casco Bay, and Tenants Harbor

8.      Prior to and after the Petition Date, the Debtors, working with their advisors, including Corporate Finance Associates ("**CFA**") as their proposed business broker, considered a variety of options to maximize the value of their assets for the benefit of all parties in interest, including a debt restructuring and various sale options.  Ultimately, after careful consideration, including the costs and risks of each option, the Debtors determined that the value-maximizing strategy was to pursue a going-concern sale of their assets to a buyer through chapter 11.  In connection with that decision, the Debtors held discussions with several interested potential buyers prior to the Petition Date, but, ultimately, no actionable offers materialized during that time.  The Debtors and CFA, however, continued those marketing discussions after the Petition Date, including with some of those same interested parties and new parties identified after the bankruptcy filings.  CFA also established a data room for interested parties and continued an active dialogue with numerous potential buyers through the early weeks of these cases.

9.      Although none has been selected as of the date of this Motion, based on the experience of the Debtors' restructuring professionals, the Debtors believe that it may further the goal of maximizing the value of the Debtors' assets to be sold (the "**Assets**") to designate a party

3

to serve as a stalking horse buyer (the "**Stalking Horse Bidder**" and the asset purchase agreement with such Stalking Horse Bidder, the "**Stalking Horse Agreement**").  As is customary, to the extent a Stalking Horse Bidder is identified, the Debtors would likely seek to grant the Stalking Horse Bidder one or more of a limited break-up fee, expense reimbursement, or other limited bid protections.  Accordingly, the Debtors reserve the right to request that the Court approve the Debtors' selection of a Stalking Horse Bidder and will provide the Court with appropriate notice thereof, as further described below.

10.    To facilitate the sale, to ensure a diligent, thorough marketing strategy and sale process, and to expose the Stalking Horse Agreement (if applicable) to higher and/or better offers, CFA will continue the marketing process in accordance with the Bid Procedures through the Bid Deadline (defined below).

### C.    Procedures for Identifying Stalking Horse Bidder

11.    As noted above, the Debtors believe that designating one or more parties to serve as a Stalking Horse Bidder in connection with the sale of the Assets would further the goal of maximizing the value of the Assets.  If the Debtors seek to enter into a Stalking Horse Agreement and seek to provide bid protections to the Stalking Horse Bidder, the Debtors will file a supplement to this Motion (a "**Supplemental Notice**") seeking approval of such protections **on or before August 11, 2025**.  Such Supplemental Notice shall include a summary of the material terms of any Stalking Horse Agreement and the proposed bid protections, and attach the Stalking Horse Agreement.  The Debtors will seek approval of the Stalking Horse Agreement at the hearing on the Bid Procedures or such other date and time as may be determined by this Court.

### D.     Milestones for the Sale Process

12.     The Bid Procedures are designed to comply with the following milestones (the "**Milestones**") negotiated between the Debtors and KeyBank N.A. ("**KeyBank**") as part of the terms of KeyBank's consent to the Debtors' ongoing use of cash collateral through the sale process:

(a)     An order approving the Bid Procedures shall be entered on or before **August 21, 2025**.

(b)     Competing bids shall be due on or before **September 23, 2025**.

(c)     An auction shall be held on or before **September 25, 2025**.

(d)     Objections to the sale shall be due on or before **September 29, 2025**.

(e)     The hearing to consider the sale shall be held on or before **October 2, 2025**.

(f)     The sale shall close on or before **October 9, 2025**.

### E.     Supplemental Disclosures

13.     The Debtors submit the following additional disclosures regarding the proposed sale process:

| Category | Disclosure |
|---|---|
| Assets that are subject of the Motion | All assets of the Debtors, which may include, without limitation, inventory, accounts receivable, equipment, machinery, furniture, fixtures, vehicles, watercraft, parts, intellectual property, trademarks and trade names, contracts, customer lists, marketing materials, and permits and licenses (as transferable).  Such assets are generally located or available at 75 St. John St., Portland, Maine, and/or such other locations as the Debtors may operate. |
| Market value of the Assets | To be determined through Bid Procedures |
| Balance due for liens on certain Assets[2] | KeyBank: Not less than $4,904,950.97<br><br>Camden National Bank: Not less than $323,855.00 |
| Applicable sections of the Bankruptcy Code and procedural rules | Sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code; Rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Bankruptcy Rules; and Local Rules 2002-1 and 9014-1 |

---

[2] See the Debtors' schedules for a specific list of assets and applicable liens.

## **RELIEF REQUESTED**

14.     By this Motion, **first**, the Debtors seek entry of the Bid Procedures Order

substantially in the form filed herewith:

(a)     approving the Bid Procedures attached to the Bid Procedures Order as **Exhibit 1** in connection with the sale (the "**Sale**") of the Assets, which may include: (x) authorizing the Debtors to enter into the Stalking Horse Agreement with the Stalking Horse Bidder (to the extent identified under the procedures set forth above), subject to Bankruptcy Court approval at the Sale Hearing, and (y) approving bid protections as may be set forth in the Stalking Horse Agreement, consisting of a break-up fee and expense reimbursement of the Stalking Horse Bidder's actual, reasonable, out-of-pocket documented fees and expenses (with a limit on these fees and expenses);

(b)     scheduling an auction (the "**Auction**") and sale hearing (the "**Sale Hearing**") with respect to the Sale;

(c)     approving the form and manner of notice of the Sale;

(d)     approving procedures for the assumption and assignment (the "**Assumption Procedures**") of certain assumed contracts and leases; and

(e)     granting related relief.

15.     **Second**, following completion of the process set forth in the Bid Procedures, the

Debtors intend to seek entry of the Sale Order at the Sale Hearing, providing the following relief:

(a)     if an Auction is conducted, authorizing and approving the sale of the Assets to the bidder(s) that the Debtors determine to have submitted the highest and/or best bid for the Assets (including a sole bidder if no Auction occurs, the "**Successful Bidder(s)**") (or, if the Successful Bidder(s) fail to consummate the Sale, to the bidder with the next-highest or second-best bid at the Auction for the Assets (the "**Backup Bidder**")), free and clear of liens, claims, encumbrances, and other interests (other than any assumed liabilities and permitted liens);

(b)     if an Auction is not conducted, authorizing and approving the Sale of the Assets to the Successful Bidder(s) if acceptable to the Debtors, free and clear of liens, claims, encumbrances, and other interests (other than any assumed liabilities and permitted liens);

(c)     authorizing the assumption and assignment of assumed contracts and leases (as will be identified) to the Successful Bidder(s) (or Backup Bidder, as applicable); and

(d)      granting certain related relief.

## THE PROPOSED SALE AND SALE SCHEDULE

16.      By this Motion, the Debtors request that this Court approve the following general timeline under the Bid Procedures, which are intended to comply with the Milestones:

(a)      **Bid Deadline**: Bids for the Assets (in form and substance as set forth in the Bid Procedures) must be received by no later than **September 23, 2025** (the "**Bid Deadline**").

(b)      **Auction**: The Auction, if necessary, shall be held on **September 25, 2025, at 10:00 a.m.,** or such other time as may be ordered by the Court.

(c)      **Sale Objection Deadline**: Objections to the Sale shall be filed and served no later than **September 29, 2025**.

(d)      **Assumed Contracts Objection Deadline**: Objections to the potential assumption and assignment of any contract or lease, including proposed cure amounts, shall be filed and served no later than **September 29, 2025**.

(e)      **Sale Hearing**: The Sale Hearing shall be held on **October 2, 2025, at 1:00 p.m.**

17.      The Debtors believe, including based on consultation with CFA, that this timeline provides a reasonable prospect of receiving the highest and/or best offer(s) under the circumstances without unduly prejudicing the estates, while still ensuring that the Sale can proceed in accordance with the Milestones and with KeyBank's support.  The Debtors further believe that the proposed timeline, including the Milestones, is sufficient to complete a fair, robust, and open sale process that will maximize the value received for the Assets.  CFA (which already has conducted pre- and post-petition marketing) will use the time following entry of the Bid Procedures Order to continue actively marketing the Assets in an attempt to solicit the highest or best bids available.  The Debtors believe that the relief requested by this Motion is in the best interests of creditors, other stakeholders, and all other parties in interest, and should be approved.

## THE BID PROCEDURES

### A.    The Bid Procedures

18.    The Bid Procedures were developed to permit an efficient (but sufficient) marketing and sale process, to promote participation and active bidding, and to ensure that the highest or best offer is received for the Assets, all in compliance with the Milestones.  The Bid Procedures describe, among other things, the procedures for designating and approving a Stalking Horse Bidder, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline for submitting a competing bid, and the method and factors for determining qualifying bids.  The Bid Procedures also recognize the obligations to maximize the value of the Assets and, as such, do not impair the ability to consider all qualified bid proposals.

### B.    The Auction and Sale

19.    If more than one Qualified Bid (defined below) is received by the Bid Deadline, the Debtors shall conduct the Auction to determine the highest and best Qualified Bid.  If no Qualified Bid (other than the Stalking Horse Agreement, if selected and approved) is received by the Bid Deadline, then the Debtors shall deem the Stalking Horse Agreement to be the Successful Bid without conducting the Auction.

### C.    Form and Manner of Notice

20.    On or within two (2) business days after entry of the Bid Procedures Order, the Debtors shall cause a copy of the Bid Procedures Order, the Bid Procedures, and the Cure and Possible Assumption and Assignment Notice (defined below) to be served on: (a) the Office of the United States Trustee for the District of Maine; (b) the holders of the 20 largest, non-insider unsecured claims against the Debtors; (c) counsel to the Stalking Horse Bidder (if identified); (d) any other parties with known secured claims against the Debtors or their counsel, if known; (e) all

parties that have executed a non-disclosure agreement (if any) with CFA; (f) the Internal Revenue Service; (g) all state and local taxing authorities with an interest in the Assets; (h) the Attorney General for the State of Maine; (i) all other known governmental agencies with an interest in the Sale and transactions proposed thereunder; (j) all other parties known or reasonably believed to have asserted an interest in the Assets; (k) the counterparties to the assumed contracts and leases (the "**Assumed Contract Counterparties**"); (l) the Debtors' insurance carriers; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.

**D.**    **Summary of the Assumption Procedures**

21.    Pursuant to the Bid Procedures Order, notice of the proposed assumption and assignment of the assumed contracts and leases, the proposed cure amounts related thereto, and the rights, procedures, and deadlines for objecting thereto, shall be provided in separate notices, attached to the Bid Procedures Order as **Exhibit 2** (the "**Cure and Possible Assumption and Assignment Notice**") to be sent to the applicable Assumed Contract Counterparties.

**BASIS FOR RELIEF**

**A.**    **The Relief Sought in the Bid Procedures Order is in the Best Interests of the Estates and Should Be Approved.**

**1.**    **The Proposed Notice of the Bid Procedures and the Sale Process is Appropriate and Sufficient.**

22.    The Debtors seek authority to sell the Assets through a competitive bidding and Auction process.  The Debtors, through CFA, will conduct an extensive marketing process (and already have been doing so, pre- and post-petition).  The Bid Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Assets, thus maximizing the value of the Debtors' estates for the benefit of creditors and other stakeholders.

23.    Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of any auction, the

terms and conditions of a sale, and the deadline for filing any objections.  The Debtors respectfully

submit that the Bid Procedures Order is reasonably calculated to provide all interested parties with

timely and proper notice of the proposed Sale.  The Debtors further submit that notice of this

Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with the

Cure and Possible Assumption and Assignment Notice, as provided for herein, constitutes good

and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and

satisfaction of, the applicable requirements of Bankruptcy Rule 2002.

### 2.    The Bid Procedures Are Appropriate and Will Maximize Value.

24.    Bid procedures may be approved when they provide a benefit to a debtor's estate

by maximizing the value of the debtor's assets.  See In re Edwards, 228 B.R. 552, 361 (Bankr.

E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public

sale designed to maximize value for the estate.").  Courts have made clear that a debtor's business

judgment is entitled to deference with respect to the procedures to be used in selling an estate's

assets.  See In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in

possession can sell property of the estate . . . if he has an 'articulated business justification'")

(internal citations omitted)); see also In re Integrated Resources, Inc., 147 B.R. 650, 656-57

(S.D.N.Y. 1992) (bid procedures negotiated by a trustee are to be reviewed in accordance with the

deferential "business judgment" standard, under which such procedures and arrangements are

"presumptively valid").  Courts recognize that procedures intended to enhance competitive bidding

are consistent with the goal of maximizing the value received by the estate and, therefore,

appropriate in the context of bankruptcy transactions.  See, e.g., In re O'Brien Envtl. Energy, Inc.,

181 F.3d 527, 537 (3d Cir. 1999); Integrated Resources, 147 B.R. at 659 (bid procedures "are

important tools to encourage bidding and to maximize the value of the debtor's assets").

25.     The Debtors submit that the Bid Procedures will establish the parameters under which the value of the Assets may be tested at the Auction.  The Bid Procedures will increase the likelihood the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.  Specifically, the proposed Bid Procedures contemplate an open auction process with minimum (but appropriate) barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.  At the same time, the proposed Bid Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or best offer for the completion of the Sale.  Additionally, entering into the Stalking Horse Agreement with the Stalking Horse Bidder (if identified) would ensure that the Debtors obtain fair market value by making a minimum purchase price for the Assets that will be tested in the marketplace, while also providing certainty to employees, vendors, suppliers, and customers that the Debtors businesses will be preserved through a sale to a well-qualified, experienced buyer in the seafood processing industry.

**3.     Entering into the Stalking Horse Agreement with Bid Protections Has a Sound Business Purpose and Should be Approved.**

26.     The Debtors are seeking approval from this Court of the Stalking Horse Agreement and to offer bid protections to the Stalking Horse Bidder (each to the extent identified and to be described in more detail in the Stalking Horse Agreement and Supplemental Notice).  The Debtors believe that, in these cases, such relief is warranted to ensure the Debtor's ability to take advantage of a potentially value-maximizing bid that also provides continuity of operations and employment opportunities to the Debtors' existing workforce.  The ability of the Debtors to offer a Stalking Horse Bidder bid protections is beneficial to the Debtors' estates and creditors in that, by providing

these incentives, the Debtors will have an opportunity to induce other bidders to submit or increase their bids prior to the Auction.

27.     The use of bid protections, such as a break-up fee, has become an established practice in chapter 11 asset sales involving the sale of significant assets because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.  See In re EWI, Inc., 208 B.R. 885, 888 (Bankr. N.D. Ohio 1997); In re Hupp Indus., Inc., 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992).  Here, the bid protections will be the product of extended, good faith, arm's length negotiations between the Debtors and the Stalking Horse Bidder, fair and reasonable, and within market for similar sales (approximately 3.00% or less of the cash portion of the purchase price).

**4.     The Proposed Notice Procedures for the Assumed Contracts and Leases Are Appropriate.**

28.     The Sale contemplates the assumption and assignment of the assumed contracts and leases to the Successful Bidder arising from the Auction (if conducted).  The Bid Procedures specify the process by which the Debtors will serve Cure and Possible Assumption and Assignment Notices and the procedures and deadline for Assumed Contract Counterparties to Assumed Contracts to file and serve Cure or Assignment Objections.  Except as may otherwise be agreed, at the closing of the Sale, the Successful Bidder shall cure those defaults under the assumed contracts and leases that need to be cured in accordance with § 365(b) of the Bankruptcy Code, by payment of the undisputed cure amount (the "**Cure Amount**").  The Debtors determined the Cure Amounts based on a careful, good faith review of their books and records, to identify the amounts owed as of the Petition Date.

29.     As set forth in the Bid Procedures Order, the Debtors also request that any party

that fails to object to the proposed assumption and assignment of any assumed contracts and leases

be deemed to consent to the assumption and assignment of the applicable assumed contracts and

leases pursuant to § 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along

with the Cure Amounts identified in the Cure and Possible Assumption and Assignment Notice.

30.     The Debtors believe that the Assumption Procedures are fair and reasonable,

provide sufficient notice to the Assumed Contract Counterparties of the potential assumption and

assignment of their assumed contracts and leases, and provide certainty to all parties in interest

regarding their obligations and rights with respect thereof.  Accordingly, the Debtors request that

this Court approve the Assumption Procedures set forth in the Bid Procedures Order.

**B.      Approval of the Proposed Sale Is Appropriate and in the Best Interests of the Estates.**

> **1.      The Sale of the Assets Should Be Authorized Pursuant to § 363 of the Bankruptcy Code.**

31.     The authority to sell assets conferred upon a debtor-in-possession by § 363(b) of

the Bankruptcy Code includes the sale of substantially all the assets of an estate.  See In re Coastal

Cable T.V., Inc., 24 B.R. 609, 611 (B.A.P. 1st Cir. 1982) (vacated on other grounds) ("A sale of

all or most of a debtor's assets may occur prior to confirmation of a plan."); Otto Preminaer Films,

Ltd. v. Qintex Entm't., Inc. (In re Qintex Entm't Inc.), 950 F.2d 1492, 1495 (9th Cir. 1991)

("Section 363 of the Code allows a debtor to sell assets of the estate . . . including a sale of

substantially all the assets of the estate.").  The power to approve a sale under § 363(b) is "within

the sound discretion of the trial court."  Coastal Cable T.V., 24 B.R. at 611.  "[A] chapter 11 debtor

may sell all or substantially all its assets pursuant to section 363(b) prior to confirmation of a

chapter 11 plan, when the court finds a good business reason for doing so."  In re General Motors

Corp., 407 B.R. 463, 491 (Bankr. S.D.N.Y. 2009); see also In re AMR Corp., 490 B.R. 158, 164

(Bankr. S.D.N.Y. 2013).

32.     The Debtors satisfy the requirement that they have a "sound business purpose" for

the sale of the Assets.   The Debtors considered various restructuring alternatives prior to

commencing the chapter 11 cases and determined that a sale of the Assets under § 363(b) will

maximize the value of the estates for the benefit of all stakeholders.   First, the Debtors believe that

the Sale will maximize the Assets' value by allowing a party to bid on assets that would have

substantially less value on a stand-alone or liquidation basis, including because the Debtors' assets

include perishable inventory, as well as specialized equipment with a limited universe of users.

Second, the sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to

receive the highest or otherwise best value for the Assets.   Ultimately, the Successful Bid, after

being subject to a "market check" in the form of the Auction and accepted by the Debtors in the

exercise of their reasonable business judgment, will constitute the highest and best offer for the

Assets, and, at this time, the Debtors believe will provide a greater recovery for the estate than any

known or practically available or feasible alternative.   See, e.g., In re Trans World Airlines, Inc.,

No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale

transaction does not require an auction procedure . . . the auction procedure has developed over

the years as an effective means for producing an arm's-length fair value transaction").

33.     As such, the Debtors' determination to explore selling the Assets through an

Auction process and subsequently to enter into the asset purchase agreement with the Successful

Bidder will be a valid and sound exercise of the Debtors' business judgment.   The Debtors will

submit evidence at the Sale Hearing to support these conclusions, as appropriate.

### 2.      Adequate and Reasonable Notice of the Sale Will Be Provided.

34.      The Bid Procedures Order will: (i) be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing following entry of the Bid Procedures Order; (ii) inform parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the assumed contracts and leases; and (iii) otherwise include all information relevant to parties interested in or affected by the Sale.  Significantly, the form and manner of such notice will have been approved by this Court pursuant to the Bid Procedures Order, after notice and a hearing, before it is served on parties in interest.

### 3.      The Sale and Purchase Price Will Reflect a Fair-Value Transaction.

35.      The Debtors and CFA will market the Assets and solicit offers consistent with the Bid Procedures and the Stalking Horse Agreement (if identified), including, without limitation, by providing acceptable bidders with access to the data room, confidential information memorandum, and other requested information.  In this way, the number of bidders that are eligible to participate in the competitive Auction process will be maximized.  On the other hand, if no Auction is held because no Auction is necessary, the Stalking Horse Agreement's purchase price will have been demonstrated to be fair value through a robust market check.

### 4.      The Sale of the Assets Should Be Free and Clear of Claims and Interests Pursuant to § 363(f) of the Bankruptcy Code

36.      The Debtors submit that it is appropriate to sell the Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to § 363(f) of the Bankruptcy Code, with any such claims and interests not released at closing attaching to the net sale proceeds of the Assets, as and to the extent applicable.

37.      Section 363(f) of the Bankruptcy Code provides that:

The trustee may sell property under [§ 363(b)] free and clear of any interest in such property of an entity other than the estate, only if—

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). "Because the language of § 363(f) is in the disjunctive, courts can approve a sale if any one of the five conditions is satisfied." BAC Home Loans Servicing LP v. Grassi, 2011 WL 6096509, at *5 (B.A.P. 1st Cir. Nov. 21, 2011).

38.    First, in relation to the consent requirements of § 363(f)(2), the Debtors will work to obtain consent from potential lienholders on the Assets. Further, this Court should deem any potential lienholders or other interest holder of any type to consent to the free and clear sale under § 363(f)(2) to the extent such interest holder does not timely object to the sale transaction after notice thereof. See BAC Home Loans, 2011 WL 6096509, at *5 ("This Panel, as well other courts in this circuit and nationally, views silence as implied consent sufficient to satisfy the consent requirement for approving a sale under § 363(f)(2).") (citing cases); In re Colarusso, 295 B.R. 166, 175 (B.A.P. 1st Cir. 2003), aff'd, 382 F.3d 51 (1st Cir. 2004) (failure to object to the sale was consent under § 363(f)(2)).

39.    Second, in relation to the requirements of § 363(f)(3), it is anticipated that the sale of the Assets may generate sufficient proceeds to satisfy some or all of the properly perfected, non-avoidable liens against the Assets (based on allocation of the sale proceeds and subject to any reservation of rights regarding any such liens).

40.    Third, under § 363(f)(4), to the extent a bona fide dispute exists as to any liens or interests, the Debtors may sell free and clear of such liens and interests, with those liens or interests attaching to the sale proceeds for future determination and allocation (if any).

41.    Fourth, under § 363(f)(5), this Court is empowered to authorize the sale free and clear of any claim or interest as long as that creditor receives the value of its collateral.  See In re Boston Generating, LLC, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010); In re Beker Indus. Corp., 63 B.R. 474, 477 (Bankr. S.D.N.Y. 1986); In re Oneida Lake Dev., Inc., 114 B.R. 352, 356-57 (Bankr. N.D.N.Y. 1990).  Interest holders, including secured creditors, could be compelled to accept a money satisfaction of their respective interests pursuant to § 363(f)(5) of the Bankruptcy Code. See, e.g., In re James, 203 B.R. 449, 453 (Bankr. W.D. Mo. 1997); In re Grand Slam U.S.A., Inc., 178 B.R. 460, 461-62 (E.D. Mich. 1995).  Courts considering this issue have held that the "cramdown" provision under the Bankruptcy Code constitutes a "legal or equitable proceeding" and permits a sale under § 363(f)(5).  See, e.g., Grand Slam, 178 B.R. at 464; In re Levitt & Sons, LLC, 384 B.R. 630, 648 (Bankr. S.D. Fla. 2008); In re Gulf States Steel, Inc. of Ala., 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002); Scherer v. Fed. Nat. Mortg. Ass'n (In re Terrace Chalet Apartments, Ltd.), 159 B.R. 821, 829 (N.D. Ill. 1993).  Any liens against the Assets released under § 363(f)(5), therefore, shall attach to the cash proceeds received from the sale of the Assets in the same force, effect, and priority as such liens had prior to the closing of the Sale, subject to all rights and defenses of the Debtors or any party in interest.

42.    For avoidance of doubt, the Milestones and related sale requirements in any final cash collateral in these cases as to KeyBank shall continue to apply to the sale of the Assets, including the requirement that any sale order under § 363(f) shall provide that the gross proceeds (other than carve-outs) from KeyBank's collateral shall be paid and applied to the indefeasible

payment of KeyBank's secured claim at closing.  KeyBank's consent to any sale and release of any

lien held by KeyBank under § 363(f) shall remain subject to such requirements, and all such rights

of KeyBank are reserved.

> **5.    The Assets and the Assumed Contracts Should Be Sold Free and Clear of Successor Liability.**

43.    The Debtors propose that the Sale Order provide that the Successful Bidder shall

not have any successor liability related to the Debtors or the Assets to the maximum extent

permitted by law.  Although § 363(f) of the Bankruptcy Code provides for the sale of assets "free

and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code.

Courts, however, have held that a buyer of a debtor's assets pursuant to a § 363 sale takes free

from successor liability resulting from pre-existing claims.  See Amphenol Corp. v. Shandler (In

re Insilco Techs., Inc.), 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a § 363 sale permits

a buyer to take ownership of property without concern that a creditor will file suit based on a

successor liability theory).   Under § 363(f) of the Bankruptcy Code, the Successful Bidder is

entitled to know that the Assets are not tainted by claims that could be asserted against the

Successful Bidder after the Sale is completed (other than agreed assumed liabilities, if any).

Absent that ruling, the value of the Assets could be compromised.  Accordingly, the Sale Order

should state that the Successful Bidder is not liable as a successor under any theory of successor

liability, for interests that encumber or relate to the Assets.

> **6.    The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good-Faith Purchaser" Entitled to the Full Protection of Bankruptcy Code § 363(m); and the Sale of the Assets Does Not Violate Bankruptcy Code § 363(n).**

44.    The Debtors request that, at the Sale Hearing, the Court find that the Successful

Bidder is entitled to the benefits and protections provided by § 363(m) of the Bankruptcy Code in

connection with the Sale of the Assets.

45.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

46.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to § 363 from the risk it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser purchased or leased the assets in "good faith."  Although the Bankruptcy Code does not define "good faith," courts have held a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that, where there is a lack of such integrity, a good faith finding may not be made.  See, e.g., Abbotts Dairies of Pa., 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); In the Matter of Andy Frain Servs., Inc., 798 F.2d 1113 (7th Cir. 1986) (same); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

47.     The Debtors anticipate that a Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, if applicable, would be a "good faith purchaser" within the meaning of § 363(m) of the Bankruptcy Code, and the resulting purchase agreement would be a good-faith agreement on arm's-length terms entitled to the protections of § 363(m) of the Bankruptcy Code. As set forth in more detail above, the consideration to be received by the Debtors pursuant to the Sale will be subject to a market process by virtue of the Debtors' marketing efforts and the Auction, and will be substantial, fair, and reasonable.  Further, where—as the Debtors anticipate will be the case here—there is no indication of any "fraud or collusion between the purchaser and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct, there is no cause that would permit the Sale to be avoided pursuant to § 363(n).  Finally, the Successful Bidder's offer will be evaluated and approved by the Debtors in consultation with their advisors.

48.    Moreover, because there will be no fraud or improper dealing of any kind, the Sale does not constitute an avoidable transaction pursuant to § 363(n) of the Bankruptcy Code, and, as a result, the purchaser should receive the protections afforded good faith purchasers by § 363(m) of the Bankruptcy Code.  Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the agreement reached with the Successful Bidder was at arm's length and is entitled to the full protections of § 363(m) of the Bankruptcy Code.  The Debtors will submit evidence at the Sale Hearing to support these conclusions, as appropriate.

**C.    The Assumption and Assignment of the Assumed Contracts and Leases Should Be Approved.**

49.    A debtor is authorized to assume an executory contract and/or unexpired lease provided that, at the time of assumption, the debtor: (a) cures, or provides adequate assurance that the debtor will promptly cure, any default; (b) compensates, or provides adequate assurance that the debtor will promptly compensate, the counterparty for any actual pecuniary loss resulting from any default; and (c) provides adequate assurance of future performance under the executory contract or unexpired lease.  See 11 U.S.C. § 365(a), (b)(1).  A default based upon the filing of the bankruptcy case or the insolvency or financial condition of the debtor need not be cured.  See 11 U.S.C. § 365(b)(2).  The standard applied in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate.  See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989).

50.     In the case of an assumption and assignment, the purchaser or assignee provides the adequate assurance of future performance.  See 11 U.S.C. § 365(f)(2).  The Bankruptcy Code does not define the term "adequate assurance," and courts have found that "the term 'adequate assurance' was intended to be given a practical, pragmatic construction."  In re DBSI, Inc., 405 B.R. 698, 708 (Bankr. D. Del. 2009).  Adequate assurance is "something less than an absolute guarantee."  Id.  Counterparties to assumed contracts and leases will have the opportunity to object to adequate assurance of future performance by Successful Bidder.  Accordingly, the Debtors submit that the assumption and assignment of the assumed contracts and leases as set forth herein should be approved.

51.     Here, this Court should approve the decision to assume and assign the assumed contracts and leases in connection with the Sale as a sound exercise of the Debtors' business judgment.  First, the assumed contracts and leases are essential to inducing the best offer for the Assets, particularly if the buyer requires the ongoing use of the Debtors' leased real property.  Second, it is unlikely any purchaser would want to acquire the Assets unless the contracts and leases that generate value are transferred in the transaction.  Third, the assumed contracts and leases will be assumed and assigned as part of a process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.  Accordingly, the Debtors submit that the assumption and assignment of the assumed contracts and leases, if required by the Successful Bidder, should be approved as a sound exercise of the Debtors' business judgment.

52.     To assist in the assumption, assignment, and sale of the assumed contracts and leases, the Debtors also request the Sale Order approving the sale of the Assets provide that anti-assignment provisions in the assumed contracts and leases shall not restrict, limit, or prohibit the

21

assumption, assignment, and sale of the assumed contracts and leases and are deemed and found to be unenforceable anti-assignment provisions within the meaning of § 365(f) of the Bankruptcy Code.  Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions.  The Debtors submit that the Bid Procedures Order complies with applicable law and will provide sufficient notice and opportunities to object to permit assignment of the assumed contracts and leases at closing.

53.     Finally, the Debtors request that they be relieved from any further liability with respect to the assumed contracts and leases after assumption and assignment to the Successful Bidder.  See 11 U.S.C. § 365(k).

**D.      Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

54.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately upon its entry by providing the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  To maximize the value received from the Assets, and to ensure that the Successful Bidder is free to close the Sale as soon as possible after entry of the Sale Order, the Debtors hereby requests that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## **NOTICE**

55.    Notice of this Motion will be given as set forth in the applicable certificate(s) of service.

WHEREFORE, the Debtors respectfully request that this Court: (i) enter the Bid Procedures Order; (ii) enter the Sale Order at the Sale Hearing; and (iii) grant such other and further relief as is just and proper.

Dated:    August 4, 2025

Respectfully submitted,
**BERNSTEIN, SHUR, SAWYER & NELSON, P.A.**

*/s/ D. Sam Anderson*
D. Sam Anderson
Adam R. Prescott
100 Middle Street
PO Box 9729
Portland, Maine 04104
Telephone: (207) 774-1200
Facsimile: (207) 774-1127
sanderson@bernsteinshur.com
aprescott@bernsteinshur.com

*Proposed Counsel to the Debtors and Debtors in Possession*