**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| COZY HARBOR SEAFOOD, INC., | ) | Chapter 11 |
| CASCO BAY LOBSTER CO., INC., and | ) | Case No. 25-20160 MAF |
| ART'S LOBSTER CO., INC., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

**KEY BANK, N.A.'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF ORDER: (I) AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO PAY PREPETITION CLAIMS, INCLUDING SECTION 503(b)(9) CLAIMS, OF CERTAIN CRITICAL VENDORS; AND (II) GRANTING RELATED RELIEF**

NOW COMES Key Bank, N.A. ("Key Bank"), by and through its undersigned counsel, and hereby objects to Debtors Cozy Harbor Seafood, Inc. ("Cozy Harbor"), Casco Bay Lobster Co., Inc. ("Casco Bay Lobster"), and Art's Lobster Co., Inc.'s ("Art's Lobster," and together, with Cozy Harbor and Casco Bay Lobster, "Debtors") Motion for Entry of Order: (I) Authorizing, But Not Directing, Debtors to Pay Prepetition Claims, Including Section 503(b)(9) Claims, of Certain Critical Vendors; and (II) Granting Related Relief [Dkt. No. 76] (the "Motion"). In support of its Objection, Key Bank states as follows:

**BACKGROUND**

1. On July 1, 2025 (the "Filing Date"), Debtors each filed an original voluntary petition under Chapter 11 of the United States Bankruptcy Code (the "Code").

2. On July 3, 2025, the Court issued its Order granting Debtors' request that the cases of Cozy Harbor, Casco Bay Lobster, and Art's Lobster be jointly administered for procedural purposes only [Dkt. No. 28].

1

3. Key Bank is a secured creditor of Debtors and holds a first priority, properly perfected secured claim on certain collateral, including Debtors' cash collateral, which cash collateral would be needed to pay the proposed vendors.

4. The budget (the "Budget") attached to this Court's *Final Order: (I) Authorizing the Use of Cash Collateral; (II) Granting Adequate Protection; and (III) Granting Related Relief* [Dkt. No. 131] (the "Cash Collateral Order"), includes a line item for payments to critical vendors up to the total amount of $25,000. The Cash Collateral Order states that "[n]o payments shall be made under the 'Critical Vendors' line in the budget without further court order approving such payments." Key Bank would consent to the payment of a vendor that truly qualified as "critical," but objects to the payment of any of the vendors listed in the Motion because none of them even comes close to being critical.

5. On July 23, 2025, Debtors filed their Motion, asserting, among other things, that there are $103,720.69 in critical vendor claims (the "Critical Vendor Claims") and, of that total, $47,910.39 are Section 503(b)(9) claims under the Code (the "503(b)(9) Claims"). *See* Ex. A to the Motion. Debtors further assert that the "doctrine of necessity" applies here and, if they do not pay the Critical Vendor Claims, those vendors will cease delivery of goods to Debtors, which will harm them and their business.

6. Key Bank objects to the use of its cash collateral to pay the proposed vendors, and objects to the Motion because no valid basis exists to make the proposed payments, and because it seeks to pay Section 503(b)(9) claims prematurely.

**ARGUMENT IN SUPPORT OF OBJECTION**

**Debtors Have Not Established That Any Vendor Is "Critical"**

7. The Code does not define what makes a vendor "critical," though as one court observed, "the main principle behind critical vendor orders is that in certain situations, they are necessary for the survival of the debtor's business and for the successful reorganization of the debtor." *In re Jeans.com, Inc.*, 502 B.R. 250, 253 (D.P.R. 2013) (internal quotation marks and punctuation omitted).

8. With that "main principle" in mind, to support a finding that a vendor is indeed "critical," a debtor generally must demonstrate the following: 1) the good or service provided by the vendor cannot be provided or performed by another vendor and, absent such good or service, the debtor cannot continue to operate, 2) the vendor has refused to continue to do business with the debtor, including refusing to accept cash on delivery or cash in advance, 3) the vendor is critical to the debtor's operations, and 4) the debtor cannot find a replacement vendor. *See id.* at 257-58 (setting forth similar standard, applying test stated in *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15 (Bankr. M.D. Fla. 2005)); *In re Zenus Is Jewelry, Inc.*, 378 B.R. 432, 433-34 (Bankr. D.N.H. 2007) (denying the debtor's motion for permission to pay five prepetition vendor creditors, reasoning it was not that "rare case" to invoke the doctrine of necessity, and it was "not a critical vendor case at all . . . [as] the testimony in this case is that there are other vendors that would be willing to sell on a C.O.D. basis. . . . In the instant case, the vendor creditors are not critical in the sense that they provide a unique product and that there is no other source for that product.");[1] *see*

---

[1] The court in *In re Jeans.com* observed that there have been very few cases from the First Circuit analyzing critical vendor issues. 502 B.R. at 256-57 (citing *Zenus* and *In re PMC Mktg. Corp.*, 2009 WL 2914232 (Bankr. D.P.R. June 16, 2009), *aff'd by* 2009 WL 5184458 (D.P.R. Dec. 22, 2009)). In *PMC Marketing*, the District of Puerto Rico affirmed the three-prong test applied by the bankruptcy court for determining "critical vendor" status, as set forth by the Bankruptcy Court for the Northern District of Texas, noting there was "no binding authority from the First Circuit" that prevented the bankruptcy court from applying such a test. *See* 2009 WL 5184458, at *5-6 ("First, the court has to determine whether it is critical that the debtor deal with that particular vendor. Second, evidence must be provided that, unless the debtor deals with the vendor, the debtor risks a probability of harm (or, alternatively, a loss of economic advantage to the estate or the debtor's going concern value) which is disproportionate to the amount of the vendor's pre-petition claim. Lastly, the court must determine whether there is no practical or legal alternative by which the debtor can deal with the vendor other than by payment of the claim.").

*also In re Murray Metallurgical Coal Holdings, LLC*, 613 B.R. 442, 451-52 (Bankr. S.D. Ohio 2020) (a "critical" vendor is one who is "in a position to cease providing goods or services to the debtor because it is not a party to a contract with the debtor" and "refuse[s] to provide goods and services unless its prepetition claim remains unpaid," and requires a showing that "the payments to critical vendors that the Debtors seek to pay will leave the other creditors at least as well off as they were before").

9. Furthermore, a critical vendor motion should only be granted under extraordinary circumstances. *See In re Corner Home Care, Inc.*, 438 B.R. 122, 126 (Bankr. W.D. Ky. 2010) (observing that authorization of payment of a pre-petition debt to unsecured creditor is an "extraordinary . . . remedy," one in which there is a "shift in jurisprudence away from granting such motions," and it is a "rarity" in which such motions are granted); *In re CoServ, L.L.C.*, 273 B.R. 487, 491 (Bankr. N.D. Tex. 2002) ("The Court does not disagree that it can allow the Debtors to pay prepetition debt other than pursuant to a plan—but holds it may do so only under extraordinary circumstances. Thousands of debtors have successfully navigated through Chapter 11 in the past without paying the prepetition claims of 'critical' vendors.").

10. Here, the Debtors have failed to offer any specific information, whether through affidavits or otherwise, regarding why any of the specifically identified vendors would qualify as "critical." Such information is particularly important where, as here, the products being purchased are commodities[2]—lobsters, crabs, fish, and bait for lobster traps. Any request to pay commodity vendors should be viewed with skepticism and the Motion itself reveals why that is so. For example, the Motion fails to state:

---

[2] Investopedia describes commodities this way: "In commerce, commodities are basic resources that are interchangeable with other goods of the same type. The quality of a given commodity may differ slightly, but it is essentially uniform across producers." https://www.investopedia.com/terms/c/commodity.asp (accessed on August 12, 2025).

- 4 -

- What specific good or service each vendor provides;

- Whether the Debtors have explained to the vendors the protections against non-payment for post-petition deliveries that are afforded by the Code and this Court's Order authorizing the use of cash collateral;

- Whether the Debtors have offered to pay each of the vendors in advance or on a cash on delivery basis;

- If so, whether each of these vendors refused to accept cash on delivery or cash in advance;

- Whether the Debtors have offered to purchase the same products from every other vendor that sells into the Debtors' market; and

- Whether the failure to receive deliveries from *these particular* vendors would cause the Debtors to stop or materially curb production of processed seafood.

11.  Rather than provide this important information, the Debtors offer only general, vague, and conclusory assertions. *See, e.g.*, Motion at 3 ("If the Debtors fail to pay the Critical Vendor Claims, then the Debtors *believe*—based on extensive, daily discussions with these parties—that the Critical Vendors will cease delivery of goods to the Debtors, which would disrupt the Debtors' post-petition cash flow and chapter 11 strategy. The loss of products provided by the Critical Vendors *could* result in the Debtors' inability to generate new inventory and sell that inventory to customers, which then generates accounts receivable that is converted to cash" (emphasis added)); *id.* at 6 ("Any failure to pay the Critical Vendor Claims would, in the Debtors' business judgment, *likely result* in the Critical Vendors refusing to provide necessary products to the Debtors, delaying deliveries, and/or renegotiating trade terms and pricing" (emphasis added)); *id.* ("Absent the relief requested herein, the Debtors *believe* that the Critical Vendors *may* refuse

to do business with the Debtors and/or attempt to renegotiate trade terms and pricing that are less favorable to the Debtors—as some have already made such threats." (emphasis added)). On the question of replacement vendors, Debtors have not sufficiently explained why, as they put it, finding replacement vendors "is not reasonably feasible" under certain unspecified time constraints. *Id.* at 4.

12. Furthermore, the Motion identifies 19 vendors as "critical," *see* Ex. A, but asserts no specific facts in support of that conclusion. The Debtors do not even assert that any of the vendors threatened to stop providing goods or has refused an alternative payment arrangement. Notably, included in the list of Critical Vendor Claims is one claim under $100 (John Hansen); six claims under $610 (David Hupper, Paula Lunt, Brendan Newell, Alan Post, Dave Dyer, and Russell Langmaid); and six claims under $3,000 (John Armstrong, Bill Lunt, Arthur Rackliff, Brent Nappi, CBS Bait and Lobster, and International C Food Inc.). These vendors do not appear to be critical in any sense. *See In re News Publ'g Co.*, 488 B.R. 241, 244-45 (Bankr. N.D. Ga. 2013) (denying critical vendor status as to 16 vendors, where no reasons were provided by the debtor as to why these vendors were "critical, as opposed to just beneficial, important, or preferred," nor was any evidence presented that these vendors "will refuse to do business with Debtor if their pre-petition debt is not paid nor that payment of a particular vendor is necessary for reorganization. Additionally, of the sixteen vendors, seven were owed $533.64 or less, and the Court was not persuaded by any of the evidence presented by Debtor that a creditor who is owed a relatively nominal amount would refuse to continue in a cash on delivery or cash in advance arrangement with Debtor").

13. The assertion that the current vendors will stop selling to the Debtors defies both experience and logic. The Debtors' have not asserted that any of their vendors have stopped selling

to them, nor would it be logical for them to do so. The Debtors can provide the vendors with adequate assurances of payment for post-petition deliveries, whether through C.O.D. terms or by pointing to the Budget. Moreover, the Debtors purchase a large enough volume of lobster, crab, and fish that a vendor "boycott" would depress demand for the products, something that would have unfavorable consequences to sellers.

14. The Motion should fail for the additional reason that the Debtors have no reasonable prospect of reorganization. Rather, the Debtors have engaged in an accelerated process to sell their assets by no later than October 9, 2025. Even assuming, *arguendo*, that denying the Motion would result in a contraction of the Debtors' business, the Debtors are unable to demonstrate good cause for using Key Bank's collateral to deviate from the payment priorities and timing set forth in the Bankruptcy Code.

15. One might reasonably postulate that the real reason for the Motion is that the Debtors' principals, who have been in the close-knit Maine lobster business for more than 40 years, are experiencing strained personal relationships with their vendors. In that regard, the mere filing of the Motion was salutary in that it showed they tried.[3]

16. Based on the foregoing, Key Bank's Objection should be sustained, and the Motion should be denied.

### Any 503(b)(9) Claims Should Be Paid Pursuant to Section 507 of The Code And Subject to Unencumbered Estate Funds Available To Pay Them

17. Section 503(b)(9) Claims should be paid only in accordance with 11 U.S.C. § 507, and even if those claims are valid and allowed, Key Bank does not consent to the 503(b)(9) Claims being paid out of its cash collateral.

---

[3] If strained personal relationships are the issue, then nothing stops the Debtors' principals from paying vendors with their own funds. Upon information and belief, the Debtors' principals have substantial equity in the real property they own and lease to the Debtors.

18. Although a bankruptcy court generally has discretion to determine when an administrative expense will be paid, it must consider in its analysis:

> [p]rejudice to the debtor, hardship to the claimant, and potential detriment to other creditors.
>
> In making this determination, one of the chief factors courts consider is bankruptcy's goal of an orderly and equal distribution among creditors and the need to prevent a race to a debtor's assets. Distributions to administrative claimants are generally disallowed prior to confirmation if there is a showing that the bankruptcy estate may not be able to pay all of the administrative expenses in full. Courts will also consider the particular needs of each administrative claimant and the length and expense of the case's administration. To qualify for exceptional immediate payment, a creditor must show that there is a necessity to pay and not merely that the Debtor has the ability to pay.

*In re NE Opco, Inc.*, 501 B.R. 233, 259 (Bankr. D. Del. 2013) (internal quotation marks, punctuation, and citations omitted).

19. Once again, as with the "critical vendor" portion of the Motion, Debtors state that "the Critical Vendors *may* refuse to supply new orders without prompt payment of their § 503(b)(9) claims. . . . Debtors *believe* that payment of the § 503(b)(9) claims is essential to avoid disruption to the Debtors' operations." Motion at 10 (emphasis added). Without evidence to support these assertions, Debtors are asking the Court and all other interested parties to guess what those creditors "may" (or may not) do if their claims are not paid now. This is not enough to grant this portion of the Motion, especially where the claims would be paid from Key Bank's collateral, no certainty exists that Key Bank's secured claim will be paid in full, and the full scope of administrative claims and funds to pay them is unknown. *See NE Opco*, 501 B.R. at 259 (denying creditor's request for immediate payment of Section 503(b)(9) claim where there was only a "possibility" the debtors would not be able to fully pay Section 503(b)(9) claims, creditor did not present "any evidence that it will suffer a hardship from the delay in payment" and "the record shows that requiring immediate payment will unduly prejudice the Debtors."); *see also In re TI*

*Acquisition, LLC*, 410 B.R. 742, 751 (Bankr. N.D. Ga. 2009) (allowing administrative expense status under Section 503(b)(9) of the Code but denying immediate payment of that claim, even where secured creditor "consented to the payment of all allowed administrative claims from its collateral").

20. Instead, any 503(b)(9) Claims should be paid only when it is determined that funds are available to pay them, and then only to the extent allowed by the Code.

21. Based on the foregoing, Key Bank's Objection should be sustained and the Motion should be denied.

## CONCLUSION

WHEREFORE, Key Bank, N.A. requests that this Court sustain its Objection, deny Debtors' Motion, and grant Key Bank such other and further relief as is just and equitable.

Dated at Portland, Maine this 13th day of August, 2025.

/s/ Roger Clement
Roger A. Clement, Esq.
Stephen B. Segal, Esq.
Shawn K. Doil, Esq.

Counsel for Key Bank, N.A.

Verrill Dana, LLP
One Portland Square, 10th Floor
Portland, ME  04101-4054
(207) 774-4000
rclement@verrill-law.com

- 9 -

## CERTIFICATE OF SERVICE

I, Roger A. Clement, Esq., hereby certify that I have caused to be served on this day, true copies of the above Objection and this Certificate of Service upon each of the parties set forth on the Service List below, via First Class U.S. mail, postage fully prepaid, or the method indicated below.

All other parties listed on the Notice of Electronic Filing have been served electronically on this date.

Dated at Portland, Maine this 13th day of August, 2025.

/s/ Roger A. Clement
Roger Clement, Esq.
Stephen B. Segal, Esq.
Shawn K. Doil, Esq.
Counsel for Key Bank, N.A.

Verrill Dana, LLP
One Portland Square, 10th Floor
Portland, ME  04101-4054
(207) 774-4000
rclement@verrill-law.com

### Service List

Vincent J. Harper (via email only)
Joseph L. Cleland (via email only)


Cozy Harbor Seafood, Inc.
Casco Bay Lobster Co., Inc.
Art's Lobster Co., Inc.
PO Box 389
Portland, ME 04112-0389

28327761_4