EXHIBIT

A

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "**Agreement**") is made and entered into effective as of November 26, 2025 (the "**Effective Date**"), by and among COZY HARBOR SEAFOOD, INC., a Maine business corporation (together with its successors and assigns, collectively, "**Cozy Harbor**"), CASCO BAY LOBSTER CO., INC., a Maine business corporation (together with its successors and assigns, collectively, "**Casco Bay**"), ART'S LOBSTER CO., INC, a Maine business corporation (together with its successors and assigns, collectively, "**Art's Lobster**" and, together with Cozy Harbor and Casco Bay, collectively, "**Sellers**"), and HARLAN AQUASHELL SEAFOODS US INC., an Indiana corporation (together with its assignor, successors, and assigns, collectively, "**Purchaser**" and, together with Sellers, the "**Parties**" and, each, a "**Party**").

## BACKGROUND

**WHEREAS**, Sellers and Purchaser (as assignee) have executed and delivered that certain Asset Purchase Agreement, dated October 20, 2025, by and among Sellers and Purchaser (together with any and all amendments, restatements, supplements, and other modifications thereto, collectively, the "**APA**"), pursuant to which, among other things, Sellers have agreed to sell, transfer, assign, set over, convey, and deliver to Purchaser, and Purchaser has agreed to purchase, acquire, and assume from Sellers, all of Sellers' respective rights, title, and interests in, to, and under the Assets (as defined in the APA) and the Assumed Liabilities (as defined in the APA) with respect to the Business (as defined in the APA); and

**WHEREAS**, in order to ensure the orderly transition of the Business from Sellers to Purchaser, and in furtherance of Sellers' and Purchaser's respective obligations under Section 10.3 of the APA ("**Additional Actions and Documents**"), Purchaser desires to engage Sellers to provide certain services to Purchaser in connection with such transition, in each case on a transitional basis, and Sellers desire to accept such engagement and to provide such services to Purchaser, upon the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual promises set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and Purchaser hereby agree, intending to be legally bound hereby, as follows:

## ARTICLE 1
## DEFINITIONS

1.1.    **Definitions**. Any and all capitalized terms that are used and not otherwise defined in this Agreement shall have the meanings ascribed to such terms, if any, in the APA.

## ARTICLE 2
## SERVICES

2.1.    **Services**. As of the Effective Date, subject to the terms and conditions set forth in this Agreement, and as consideration in full for the Services Fees (as defined in Article 3 hereof), Purchaser hereby engages Sellers to provide certain transition services to Purchaser with respect to the Business for the duration of the Term (as defined below), which services are set forth in **Schedule A** attached hereto and incorporated herein by reference (collectively, "**Services**"), and Sellers hereby accept such engagement and agree to provide the Services to Purchaser for the duration of the Term. Sellers and Purchaser hereby acknowledge and agree that the Services are transitional in nature and, as such, Purchaser hereby covenants and agrees to use commercially reasonable efforts to transition the provision of the Services from Sellers

to Purchaser, to one or more third-party service providers engaged by Purchaser, or any combination thereof, as promptly as practicable after the Effective Date.

2.2. **Standard of Performance**. Each of Sellers hereby represents, warrants, and agrees that the Services shall be provided in good faith, in accordance with applicable law, and, except as specifically provided in **Schedule A**, in a manner generally consistent with the historical provision of the Services and with the same standard of care as historically provided by each of Sellers with respect to the Business. Subject to Section 2.3 hereof, Sellers shall assign and allocate sufficient resources and qualified personnel as are reasonably required to perform the Services in accordance with the standards set forth in this Section. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS SECTION, SELLERS MAKE NO REPRESENTATION AND WARRANTY OF ANY KIND OR NATURE WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE, ALL OF WHICH ARE HEREBY EXPRESSLY DISCLAIMED.

2.3. **Third-Party Service Providers**. Each of Sellers may, at any time and from time to time, engage one or more third-party service providers to provide all or part of the Services hereunder; provided, however, that Sellers shall remain liable for the provision of such Services to Purchaser to be performed by any such third-party service provider.

2.4. **Access to Premises**.

(a) In order to enable the provision of the Services by Sellers, Purchaser shall provide Sellers and their respective employees and third-party service providers, at no cost to Sellers, access to enter upon, use, occupy, and possess the properties, facilities, assets, and books and records of the Business, to the extent necessary for Sellers and their respective employees and third-party service providers to provide the Services to Purchaser and to otherwise fulfill their respective obligations under this Agreement.

(b) Each of Sellers hereby acknowledges and agrees that all of its employees and third-party service providers, when on any of the properties or facilities owned or controlled by Purchaser with respect to the Business or when given access to any equipment, computer, software, network, or files owned or controlled by Purchaser, shall conform to the policies and procedures of Purchaser concerning health, safety, and security that are made known to Sellers in advance in writing.

**ARTICLE 3**
**COMPENSATION**

3.1. **Services Fees**. During the Term, subject to the terms and conditions set forth in this Agreement, and as consideration in full for the provision of the Services hereunder, Purchaser shall pay to Sellers a fee in the amounts set forth on **Schedule B** (each such fee, a "**Services Fee**" and, collectively, the "**Services Fee**"). The Services Fee shall be paid in lawful money of the United States of America by certified check or wire transfer of immediately available funds to an account of Sellers with a bank, credit union, or other financial institution designated in writing by Sellers to Purchaser.

3.2. **Costs and Expenses**. During the Term, subject to the terms and conditions set forth in this Agreement, Purchaser shall reimburse Sellers for all reasonable costs and expenses incurred by Sellers in connection with the performance of their obligations hereunder, which include, without limitation, the provision of the Services, within ten (10) days after the date on which Sellers provide Purchaser with an invoice in writing requesting reimbursement for such costs and expenses, together with any receipts and other reasonable supporting documentation in connection therewith.

# ARTICLE 4
## CONFIDENTIALITY

4.1.    **Confidentiality; Non-Disclosure and Non-Use**. During the Term and continuing in perpetuity thereafter, each Party hereby covenants and agrees that, if, at any time, any Party discloses any of such Party's Confidential Information (as defined below) (each such disclosing Party, a "**Disclosing Party**") to any other Party (each such receiving Party, a "**Receiving Party**") or any of Receiving Party's Representatives (as defined below), then Receiving Party shall (a) except as otherwise required by applicable law, protect and safeguard the confidentiality of Disclosing Party's Confidential Information with at least the same degree of care as Receiving Party would protect Receiving Party's Confidential Information, but in no event with less than a commercially reasonable degree of care; and (b) not use any of Disclosing Party's Confidential Information, or permit or allow any of Disclosing Party's Confidential Information to be accessed or used, (i) for any purpose other than for the purpose of performing Receiving Party's obligations under this Agreement, or (ii) in any manner to the detriment or disadvantage of Disclosing Party, including, without limitation, to reverse engineer, disassemble, decompile, or design around Disclosing Party's proprietary services, products, and/or intellectual property; and (c) be responsible for any breach of this Article caused by any of Receiving Party's Representatives; and (d) except upon the prior written consent of Disclosing Party, not disclose any of Disclosing Party's Confidential Information to any person, except to any of Receiving Party's Representatives who (i) needs to know Disclosing Party's Confidential Information to assist Receiving Party, or act on behalf of Receiving Party, in connection with the performance of Receiving Party's obligations under this Agreement or applicable law or to exercise Receiving Party's rights or remedies under this Agreement or applicable law; and (ii) is informed by Receiving Party of the confidential nature of Disclosing Party's Confidential Information; and (iii) is subject to confidentiality duties or obligations to Receiving Party with respect to Disclosing Party's Confidential Information that are no less restrictive than the terms and conditions set forth in this Agreement. This Section shall survive the effective date of the expiration or earlier termination of this Agreement in perpetuity.

4.2.    **Required Disclosure**. Any disclosure by Receiving Party or any of Receiving Party's Representatives of any of Disclosing Party's Confidential Information that is required under applicable law or a governmental order shall be subject to the terms of this Section. Before making any such disclosure, Receiving Party or any of Receiving Party's Representatives shall use commercially reasonable efforts to provide Disclosing Party, to the extent permitted, with (a) prompt written notice of such requirement so that Disclosing Party may, at Disclosing Party's sole cost and expense, seek a protective order or other remedy to prevent the disclosure of Disclosing Party's Confidential Information; and (b) reasonable assistance, at Receiving Party's sole cost and expense, in opposing such disclosure or seeking a protective order or other limitations on disclosure. If, after providing such notice and assistance as required herein, Receiving Party or any of Receiving Party's Representatives is required by applicable law or a governmental order to disclose any of Disclosing Party's Confidential Information, then Receiving Party or any of Receiving Party's Representatives or other persons to whom such law applies, or such governmental order is directed, shall (A) disclose no more than that portion of Disclosing Party's Confidential Information that, upon the advice of Receiving Party's legal counsel or any of Receiving Party's Representatives' legal counsel, such law or governmental order requires Receiving Party or any of Receiving Party's Representatives to disclose; and (B) upon Disclosing Party's request, use commercially reasonable efforts to obtain assurances from the applicable court or governmental agency that such Confidential Information will be afforded confidential treatment no less restrictive than the terms and conditions set forth in this Agreement.

4.3.    **Return or Destruction of Confidential Information**. During or after the Term, Receiving Party shall, upon the written request of Disclosing Party, promptly return to Disclosing Party all copies, whether in written, electronic, or other form or media, of Disclosing Party's Confidential Information, or

destroy all such copies and certify in writing to Disclosing Party that such Confidential Information has been destroyed. Receiving Party shall also destroy all copies of any Notes (as defined below) created by Receiving Party or any of Receiving Party's Representatives and certify in writing to Disclosing Party that such copies have been destroyed. Notwithstanding the foregoing, Receiving Party may retain a copy of Disclosing Party's Confidential Information solely to the extent that the retention of such Confidential Information is required for compliance with applicable law or any governmental order, which copy shall remain as Confidential Information governed by this Article.

4.4. **No Representations or Warranties**. Neither Disclosing Party, nor any of Disclosing Party's Representatives, makes any representation or warranty, expressed or implied, as to the accuracy or completeness of Disclosing Party's Confidential Information disclosed hereunder to Receiving Party or any of Receiving Party's Representatives. Neither Disclosing Party, nor any of Disclosing Party's Representatives, shall be liable to Receiving Party or any of Receiving Party's Representatives relating to, or resulting, from Receiving Party's or any of Receiving Party's Representatives' use of any of Disclosing Party's Confidential Information or any errors therein or omissions therefrom. The transmission of any of Disclosing Party's Confidential Information hereunder shall not constitute any representation, warranty, assurance, guarantee, or inducement by Disclosing Party with respect to the infringement of patents, copyrights, trade secrets, or other intellectual or proprietary rights of any third party.

4.5. **No Transfer of Right, Title, or Interest**. Disclosing Party hereby retains all of Disclosing Party's right, title, and interest, including, without limitation, all intellectual property rights, in, to, and under all of Disclosing Party's Confidential Information. Any disclosure of such Confidential Information hereunder shall not be construed as an assignment, grant, option, license, or other transfer, whether express or implied, of any such right, title, or interest whatsoever, to Receiving Party or any of Receiving Party's Representatives.

4.6. **Specific Definitions**. For the purposes of this Agreement, the following terms shall have the following, respective meanings:

(a) "**Confidential Information**" means any and all non-public, confidential, and/or proprietary information disclosed at any time on or after the Effective Date by Disclosing Party to Receiving Party or any of Receiving Party's Representatives, whether disclosed orally or disclosed or accessed in written, electronic, or other form or media, and whether or not marked, designated, or otherwise identified as "confidential," which information includes, without limitation: (i) all information concerning Disclosing Party's and its customers', suppliers', and other related third parties' past, present, and future business affairs, including, without limitation, finances, customer information, supplier information, products, services, organizational structure, ownership structure, and internal practices, forecasts, sales and other financial results, records, and budgets, and business, marketing, development, sales, and other commercial plans and strategies; and (ii) all of Disclosing Party's intellectual property rights, which includes, without limitation, designs, drawings, inventions, ideas, Recipes, methods, formulas, processes, and discoveries, trade secrets, know-how, and unpublished patent applications; and (iii) all of Disclosing Party's designs, specifications, documentation, components, source code, object code, images, icons, audiovisual components, and objects, schematics, drawings, protocols, processes, and other visual depictions, in whole or in part, of any of the foregoing; and (iv) any third-party confidential information included with, or incorporated in, any such information provided by Disclosing Party to Receiving Party or any of Receiving Party's Representatives; and (v) all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations, and other materials prepared by or for Receiving Party or any of Receiving Party's Representatives that contain, are based on, or otherwise reflect or are derived from, in whole or in part, any of the foregoing (collectively, the "**Notes**"); provided, however, that the definition of the term "Confidential Information," as such quoted term is used in this Agreement, shall not include such information that: (A) on the date and time of disclosure is, or thereafter becomes, generally available to and

Docusign Envelope ID: 2451285A79C24F48-BF3A-49673226B5FB    Case 25-20160    Doc 366-2    Filed 04/02/26    Entered 04/02/26 12:04:26    Desc

Exhibit A    Page 5 of 15

known by the public, other than as a direct or indirect result of any violation of this Agreement by Receiving Party or any of Receiving Party's Representatives; (B) on the date and time of disclosure is, or thereafter becomes, available to Receiving Party or any of Receiving Party's Representatives on a non-confidential basis from a third party; provided, however, that such third party is not, and was not, prohibited from disclosing such information to Receiving Party or any of Receiving Party's Representatives by a legal, fiduciary, or contractual obligation to Disclosing Party; (C) was known by, or in the possession of, Receiving Party or any of Receiving Party's Representatives, as established by documentary evidence, before the date and time of disclosure by, or on behalf of, Disclosing Party under this Agreement; or (D) was, or is, independently developed by Receiving Party or any of Receiving Party's Representatives, as established by documentary evidence, without reference to, or use of, in whole or in part, any of the Confidential Information.

(b)    "**Representatives**" means, with respect to any Party, all of such Party's affiliates, subsidiaries, directors, officers, managers, equity owners, employees, independent contractors, and agents.

## ARTICLE 5
## TERM AND TERMINATION

5.1.    **Term**. The term of this Agreement shall commence on the Effective Date and continue for a period of up to sixty (60) calendar days after the Effective Date, unless earlier terminated pursuant to, and in accordance with, Section 5.2 hereof (the "**Term**").

5.2.    **Termination**. This Agreement may be terminated before the effective date of the expiration of the Term: (a) by the Parties upon the written consent of the Parties, or (b) by either Party upon written notice thereof to the other Party, if the other Party is in breach of any provision of this Agreement, the non-breaching Party provides the breaching Party with written notice of such breach, and the breaching Party fails to cure such breach within ten (10) days after the date of receipt of such written notice; or (c) by Purchaser upon written notice thereof to the other Party at least ten (10) days before the effective date of such termination.

5.3.    **Post-Termination Obligations**. Upon the effective date of the expiration or earlier termination of this Agreement, no Party shall have any further obligation hereunder whatsoever; provided, however, that (a) any obligations that accrue before the effective date of the expiration or earlier termination of this Agreement shall survive after the effective date of the expiration or earlier termination of this Agreement, and (b) any obligations, promises, or covenants set forth in this Agreement that expressly survive or by operation of law extend after the effective date of the expiration or earlier termination of this Agreement shall survive after the effective date of the expiration or earlier termination of this Agreement in accordance with their respective terms.

## ARTICLE 6
## INSURANCE

6.1.    **Insurance**. During the Term and for a period of one (1) year thereafter, Purchaser shall, at its own cost and expense, maintain and carry insurance with financially sound and reputable insurers necessary to own and operate the Business, in full force and effect, which insurance shall include, without limitation, commercial general liability with limits no less than Two Million and 00/100 Dollars ($2,000,000.00) for each occurrence and Four Million and 00/100 Dollars ($4,000,000.00) in the aggregate. Upon Sellers' request, Purchaser shall provide Sellers with a certificate of insurance from Purchaser's insurer evidencing the insurance coverage specified in this Agreement. The certificate of insurance shall name Sellers as additional insureds. Purchaser shall provide Sellers with written notice of any cancellation or material change in Purchaser's insurance policy at least thirty (30) days before the effective date of such

cancellation or material change. Except where prohibited by law, Purchaser shall require Purchaser's insurer to waive all rights of subrogation against Sellers and Sellers' insurers. Purchaser shall indemnify and hold Sellers harmless in relation to any and all claims arising out of or relating to this Agreement, except to the extent arising from the gross negligence or willful misconduct of Sellers.

## ARTICLE 7
### LIMITATION OF LIABILITY

7.1. **LIMITATION OF LIABILITY**.

(a) IN NO EVENT SHALL SELLERS BE LIABLE TO PURCHASER OR ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE, OR PROFIT OR LOSS OF DATA OR DIMINUTION IN VALUE, OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, OR PUNITIVE DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT SELLERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

(b) IN NO EVENT SHALL SELLERS' AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, EXCEED THE AGGREGATE AMOUNTS PAID TO SELLERS PURSUANT TO THIS AGREEMENT.

(c) THE FOREGOING LIMITATIONS SHALL NOT APPLY, HOWEVER, TO SELLERS' OBLIGATION WITH RESPECT TO THOSE MONIES BELONGING TO PURCHASER FROM PAYMENTS MADE BY CUSTOMERS OF THE BUSINESS THAT ARE TO BE REMITTED TO PURCHASER PURSUANT TO OR IN CONNECTION WITH THE APA OR THIS AGREEMENT, AS REFERENCED IN **SCHEDULE A** ATTACHED HERETO.

## ARTICLE 8
### MISCELLANEOUS

8.1. **Notices**. Any and all notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be made pursuant to, and in accordance with, Section 10.7 of the APA ("**Notices**").

8.2. **Entire Agreement**. This Agreement, together with any and all exhibits and schedules attached hereto, constitutes the sole and entire agreement of the Parties with respect to the provision of Services by Sellers to Purchaser. Nothing contained herein is intended to supersede or diminish the provisions of the APA, which remains in full force and effect.

8.3. **Severability**. If any provision of this Agreement is deemed illegal or unenforceable, or contrary to, inconsistent with, or in conflict with, or would result in a waiver of any rights of any Party under, such laws, then such provision shall be void and unenforceable and the applicable provisions of such laws shall govern and be controlling; provided, however, that all other provisions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

8.4. **Amendment**. No amendment, restatement, supplement, or other modification to this Agreement will be effective, unless such amendment, restatement, supplement, or other modification is in writing, identified as such amendment, restatement, supplement, or other modification, and signed by each

Party to this Agreement. Any purported amendment, restatement, supplement, or other modification to this Agreement in violation of this Section shall be null and void and of no force and effect whatsoever.

8.5. **Waiver**. No waiver by any Party of any of the provisions hereof will be effective, unless such waiver is in writing, identified as such waiver, and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any subsequent failure, breach, or default, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof on any other occasion, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

8.6. **Assignment; No Third-Party Beneficiaries**. No assignment, transfer, delegation, or subcontract of this Agreement, in whole or in part, or any rights or obligations under this Agreement, in whole or in part, will be effective, unless such assignment, transfer, delegation, or subcontract is in writing, identified as such assignment, transfer, delegation, or subcontract, and signed by the non-assigning, non-transferring, non-delegating, or non-subcontracting Party. This Agreement is for the sole and exclusive benefit of the Parties and their respective successors and permitted assigns, and nothing in this Agreement, express or implied, is intended to, or shall, confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever under, or by reason of, this Agreement.

8.7. **Further Assurances**. Each of the Parties shall use commercially reasonable efforts, from time to time upon the request of the other Party, without any additional consideration, to furnish the other party with such further information or assurances, execute and deliver such additional documents, instruments, and conveyances, and take such other actions and do such other things, as may be reasonably necessary or convenient for the Parties to carry out the provisions of this Agreement and to give effect to the transactions contemplated hereby.

8.8. **Relationship of the Parties**. The relationship between Sellers and Purchaser is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the Parties, and no Party shall have authority to contract for or bind the other party in any manner whatsoever.

8.9. **Terms of, and Coordination with, APA**. In the event of any conflict between any of the provisions set forth in the APA and any of the provisions set forth in this Agreement, the provisions set forth in the APA shall govern and control in all respects.

8.10. **Governing Law**. In the event the federal bankruptcy laws do not apply, this Agreement shall be governed by, and construed in accordance with, the internal law of the State of Maine without giving effect to any choice or conflict of Law provision or rule (whether of the State of Maine or any other jurisdiction) that would cause the application of law of any jurisdiction other than the State of Maine.

8.11. **Binding Effect**. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and permitted assigns.

8.12. **Counterparts**. This Agreement may be executed in multiple counterparts, each of which will be deemed an original, and all of which together will be deemed to be one and the same agreement. The delivery of an executed counterpart of this Agreement by electronic mail in portable document format (.pdf), or any other electronic means intended to preserve the original graphic and pictorial appearance of a document has the same effect as delivery of an executed original counterpart of this Agreement.

**IN WITNESS WHEREOF**, Sellers and Purchaser have executed and delivered this Agreement by their respective duly authorized representatives as of the Effective Date.

**SELLERS:**

COZY HARBOR SEAFOOD, INC.

By: _____
Name:   John Norton
Title:   President

CASCO BAY LOBSTER CO., INC.

By: _____
Name:   John Norton
Title:   President

ART'S LOBSTER CO., INC.

By: _____
Name:   John Norton
Title:   President

**PURCHASER:**

HARLAN AQUASHELL SEAFOODS US INC.

By: _____
Name:   Hal P. Harlan
Title:   President

5128524.3

Transition Services Agreement
Signature Page

**IN WITNESS WHEREOF,** Sellers and Purchaser have executed and delivered this Agreement by their respective duly authorized representatives as of the Effective Date.

**SELLERS:**

COZY HARBOR SEAFOOD, INC.


By:_____
Name:  John Norton
Title:    President

CASCO BAY LOBSTER CO., INC.


By:_____
Name:  John Norton
Title:    President

ART'S LOBSTER CO., INC.


By:_____
Name:  John Norton
Title:    President

**PURCHASER:**

HARLAN AQUASHELL SEAFOODS US INC.


By: _____
Name:  Hal P. Harlan
Title:    President


5128524.3

Transition Services Agreement
Signature Page

## Schedule A

### SERVICES

For the purposes of this Agreement, the term "**Services**" shall mean the following: (1) Sellers shall allow Purchaser to use the "approved vendor status" of Sellers, which includes vendor number and related electronic data interchange (EDI) systems of Sellers in relation to transacting business with Hannaford Supermarkets and any other customers of the Business as to whom Purchaser requires the assistance of Sellers to facilitate the sale of goods for the account of Purchaser to customers of the Business (To the extent monies are paid to Sellers by customers of the Business as a result thereof (or otherwise owing to Purchaser on account of assets of Purchaser), such monies will be promptly remitted to Purchaser, in no event more than five (5) days after the date of receipt thereof, subject to the Services Fees and any other amounts owed by Purchaser to Sellers under the APA.); and (2) to the extent that any Permits and Licenses of Sellers are not legally assignable to Purchaser pursuant to the APA and Purchaser has not acquired its own corresponding Permits and Licenses, then, solely to the extent permitted under applicable law, Sellers shall permit Purchaser to operate under Sellers' Permits and Licenses until Purchaser acquires its own corresponding Permits and Licenses, and (3) solely to the extent permitted under applicable law, Sellers shall provide Purchaser with access to Sellers' employer account with Automatic Data Processing (ADP) to allow Purchaser to obtain payroll and other payment-related information concerning Sellers' employees with respect to the Business that Purchaser elects to employ with respect to the Business as of the Effective Date.

The Parties intend that, during the Term, the Sellers will act as a mere conduit in receiving and remitting proceeds to Purchaser under this Agreement and that, therefore, such proceeds are not property of the bankruptcy estate and are not "disbursements" for purposes of computing the Sellers' quarterly U.S. Trustee fees. The Parties shall reasonably cooperate as necessary to ensure that the estate is not assessed U.S. Trustee fees on the proceeds remitted to Purchaser under this Agreement. However, in the event that the bankruptcy court determines that the estate owes any U.S. Trustee fees with respect to proceeds remitted to Purchaser under this Agreement, the Purchaser will pay such fees to the estate within 10 business days after such order is entered.

## Schedule B

## SERVICES FEES

For the purposes of this Agreement, the term "**Services Fees**" shall mean the sum of $20,000 per month for the duration of the Term, plus U.S. Trustee fees to the extent required under the terms of this Agreement. Such fees will be prorated for partial months to the extent the Agreement terminates earlier than the Term specified in Section 5.1 of the Agreement.

## FIRST AMENDMENT TO TRANSITION SERVICES AGREEMENT

This FIRST AMENDMENT TO TRANSITION SERVICES AGREEMENT (this "**Amendment**") is made and entered into effective as of February 25, 2026 (the "**Effective Date**"), by and among COZY HARBOR SEAFOOD, INC., a Maine business corporation (together with its successors and assigns, collectively, "**Cozy Harbor**"), CASCO BAY LOBSTER CO., INC., a Maine business corporation (together with its successors and assigns, collectively, "**Casco Bay**"), ART'S LOBSTER CO., INC, a Maine business corporation (together with its successors and assigns, collectively, "**Art's Lobster**" and, together with Cozy Harbor and Casco Bay, collectively, "**Sellers**"), and HARLAN AQUASHELL SEAFOODS US INC., an Indiana corporation (together with its assignor, successors, and assigns, collectively, "**Purchaser**" and, together with Sellers, the "**Parties**" and, each, a "**Party**").

## BACKGROUND

**WHEREAS**, pursuant to, and in accordance with, that certain Asset Purchase Agreement, dated October 20, 2025, by and among Purchaser and Sellers, as amended by that certain First Addendum to Asset Purchase Agreement, dated October 20, 2025, by and among Purchaser and Sellers, and as further amended by that certain Second Addendum to Asset Purchase Agreement, dated November 20, 2025, by and among Purchaser and Sellers (together with any and all further amendments, restatements, supplements, and other modifications thereto, collectively, the "**APA**"), Purchaser and Sellers, among other things, executed and delivered that certain Transition Services Agreement, dated November 26, 2025, by and among Purchaser and Sellers (together with any and all amendments, restatements, supplements, and other modifications thereto, collectively, the "**TSA**"), pursuant to which Purchaser engaged Sellers to provide certain services to Purchaser in connection with the orderly transition of the Business (as defined in the APA) from Sellers to Purchaser; and

**WHEREAS**, pursuant to, and in accordance with, Section 8.4 of the TSA, Purchaser and Sellers desire to amend the TSA upon the terms and conditions set forth in this Amendment.

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual promises set forth in this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Sellers hereby agree, intending to be legally bound hereby, that the TSA is hereby amended as follows:

1.    **Definitions; Recitals.** Any and all capitalized terms that are used but not otherwise defined in this Amendment shall have the definitions ascribed to them, if any, in the TSA, as expressly amended by this Amendment. Any and all references in this Amendment and the TSA to "the Agreement," "this Agreement," "the Transition Services Agreement," "this Transition Services Agreement," "this TSA," or "the TSA," and any similar words or phrases shall be deemed to refer to the TSA, as expressly amended by this Amendment. The foregoing recitals are hereby incorporated herein by reference and made a part hereof.

2.    **Amendments.** As of the Effective Date, subject to the terms and conditions set forth in this Agreement, the TSA is hereby amended as follows:

(a)    Section 5.1 of the TSA is hereby deleted and replaced in its entirety by the following provision:

"5.1.    **Term.** The initial term of this Agreement shall commence on the Effective Date and continue for a period of up to sixty (60) calendar days after the Effective Date (the "**Initial Term**"). Upon the effective date of the expiration of the Initial Term, the term of this Agreement shall

Page 1

Docusign Envelope ID: 8462F94E-F42A-4A4E-9BBC-13BE26FCAB61

renew automatically for successive, monthly renewal terms, each consisting of thirty (30) calendar days, until terminated pursuant to, and in accordance with, Section 5.2 hereof (each such renewal term, a "**Renewal Term**" and, together with the Initial Term, collectively, the "**Term**")."

(b)    Section 5.2(c) of the TSA is hereby deleted and replaced in its entirety by the following provision:

"(c) by Purchaser upon written notice thereof to the other Party at least one (1) day before the effective date of such termination."

(c)    The sole paragraph in ***Schedule B*** to the TSA is hereby deleted and replaced in its entirety by the following provision:

"For the purposes of this Agreement, the term "**Services Fees**" shall mean the sum of Twenty Thousand and 00/100 Dollars ($20,000.00) per month for the duration of the Initial Term and Ten Thousand and 00/100 Dollars ($10,000.00) per month for the duration of each Renewal Term, plus U.S. Trustee fees to the extent required under the terms of this Agreement. Such fees will be prorated for partial months to the extent the Agreement terminates earlier than the Term specified in Section 5.1 of this Agreement."

(d)    The phrase "Permits and Licenses" in the TSA is hereby deleted and replaced in its entirety by the phrase "Licenses and Permits".

3.    **Ratification of TSA.** Purchaser and Sellers hereby acknowledge and agree that, (a) except as expressly amended by this Amendment, all of the terms and conditions set forth in the TSA are, and will remain, unchanged and in full force and effect in all respects and such terms and conditions are hereby ratified, confirmed, and approved in all respects (including, without limitation, remittance to Purchaser within five (5) days after receipt as provided in Schedule A), and (b) the TSA, as expressly amended by this Amendment, and all rights and obligations of the parties hereunder, are hereby ratified, confirmed, and approved in all respects.

4.    **Governing Law.** This Amendment shall be governed by, and construed in accordance with, the internal laws of the State of Maine without giving effect to any choice or conflict of law provision or rule (whether of the State of Maine or any other jurisdiction) that would cause the application of laws of any jurisdiction other than the State of Maine.

5.    **Counterparts.** This Amendment may be executed in multiple counterparts, each of which will be deemed an original, and all of which together will be deemed to be one and the same agreement. The delivery of an executed counterpart of this Amendment by electronic mail in portable document format (.pdf) or any other electronic means intended to preserve the original graphic and pictorial appearance of a document will have the same effect as delivery of an executed original counterpart of this Amendment.

*[Signature Page Follows.]*

**IN WITNESS WHEREOF**, Purchaser and Sellers have executed and delivered this First Amendment to Transition Services Agreement by their respective duly authorized representatives as of the Effective Date.

**PURCHASER:**

HARLAN AQUASHELL SEAFOODS US INC.

By: *Hal P. Harlan*
Name:  Hal P. Harlan
Title:   President

**SELLERS:**

ART'S LOBSTER CO., INC.

By:
Name:  John Norton
Title:   President

CASCO BAY LOBSTER CO., INC.

By:
Name:  John Norton
Title:   President

COZY HARBOR SEAFOOD, INC.

By:
Name:  John Norton
Title:   President

5215905.3

Docusign Envelope ID: 8462F94E-F42A-4A4E-9BBC-13BE26FCA861

**IN WITNESS WHEREOF**, Purchaser and Sellers have executed and delivered this First Amendment to Transition Services Agreement by their respective duly authorized representatives as of the Effective Date.

**PURCHASER:**

HARLAN AQUASHELL SEAFOODS US INC.

By:_____
Name:  Hal P. Harlan
Title:   President

**SELLERS:**

ART'S LOBSTER CO., INC.

By:_____
Name:  John Norton
Title:   President

CASCO BAY LOBSTER CO., INC.

By:_____
Name:  John Norton
Title:   President

COZY HARBOR SEAFOOD, INC.

By:_____
Name:  John Norton
Title:   President

Signature Page